592 So.2d 1382 (1991)
Ferrall T. SPENCER
v.
STATE of Mississippi.
No. 89-KA-1242.
Supreme Court of Mississippi.
December 31, 1991.
*1383 John T. Haltom, Indianola, for appellant.
Mike C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and BANKS and McRAE, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This appeal concerns a crime committed by an inmate on the prison grounds in Parchman, Mississippi. The appellant, Ferrall *1384 T. Spencer, was charged with possession of cocaine with intent to distribute. After a trial by a jury of his peers in the Sunflower County Circuit Court, Ferrall T. Spencer was convicted of the lesser included offense of possession of cocaine. Spencer was sentenced to three years in the Mississippi Department of Corrections, said sentence to run consecutive to any sentence he was then serving. Additionally, Spencer was fined $10,000.00 and was ordered to pay court costs in the amount of $822.50.
Now Spencer appeals his conviction and sentence to this Court alleging denial of his right to a speedy trial as guaranteed by the Sixth Amendment of the United States Constitution. Upon careful consideration of the law and the record in this case, we find no violation of the appellant's Sixth Amendment right and thereby affirm the conviction and sentence entered by the Sunflower County Circuit Court.

FACTS
On April 21, 1988, Mr. James Williams and his wife, Terry, walked into the Greenwood Police Station carrying a shoe box which had been wrapped in brown paper. The package was addressed to "Mr. Jamie Williams, P.O. Box 41, Greenwood, Miss. 38930." Although the record is not completely clear on this point, it appears that James and Terry Williams received the package by way of a United Parcel Service (UPS) delivery, although the package had a post office address listed for the addressee. Mr. and Mrs. Williams were not expecting a package, but nevertheless, they opened it. They found a pair of new Nike tennis shoes, and inside one of the shoes they found medicine bottles which contained a total of four bags of a white powdery substance.
When Mr. and Mrs. Williams walked into the police station with their discovery, they met Detective Melvin Andrews who immediately took the box to the Mississippi Bureau of Narcotics division located in Greenwood and turned it over to agent Artie Hitchins.
Agent Hitchins employed a little basic detective work by looking up the name "Jamie Williams" in the Greenwood telephone book. He found another listing under this name. He then enlisted the help of the secretary in the office and had her call the telephone number listed for the other "Jamie Williams." The secretary called the number and reached a female on the other end. The secretary identified herself as a "Brenda Williams" and explained that she had received a package in the mail by mistake and asked the woman if she was expecting a package. The woman stated that they were expecting a package and seemed anxious to receive it. The secretary told the lady that she was having her car serviced at a Gulf service station and would be there for a few minutes. The female on the other end stated that her husband would be right along to retrieve the package. The service station was located directly across the street from the Bureau of Narcotics office in Greenwood. The secretary went to the station with the package which had been rewrapped while other agents set up surveillance. Shortly, a gentleman arrived and approached the secretary. He fit the description given to the secretary by the female voice on the phone. The secretary and the gentleman exchanged some small talk, and she asked him for some identification before turning over the package. He produced a check stub, and she gave him the package. The gentleman thanked the secretary and returned to his car. As he was getting into his car, the narcotics agents moved in and arrested him. After the arrest, all parties went back across the street to the Bureau of Narcotics office.
It was soon learned that the gentleman who had just been arrested was Officer Jamie Williams, who was employed as a *1385 guard at Parchman.[1] Officer Williams agreed to cooperate with the authorities in any way that he could. Williams told the narcotics officials that the package was intended for inmate Ferrall Spencer. According to Williams, he agreed that he would receive a package from Spencer's father and deliver it to Spencer at the penitentiary.
Next, the Bureau of Narcotics officials had Officer Williams to telephone inmate Ferrall Spencer at Parchman. This conversation was tape recorded and entered into evidence at trial. In the taped conversation, Williams asked Spencer if he wanted the package. Spencer replied that he did and confirmed that he was going to pay Williams two hundred dollars ($200.00) for his efforts in helping to smuggle the package. Williams told Spencer that he would bring in the package that night when he reported for his midnight duty shift at the prison.
The Bureau coordinated several points with the corrections officials at Parchman. When Officer Williams reported for work that night on the midnight shift, he was wired with a transmitter. Corrections officials made arrangements for Agent Hitchins to dress in a prisoner's outfit so that he could enter the compound and watch the transaction. Another corrections officer and narcotics officer were stationed with Agent Hitchins. These three officers carried a transmitter so they could hear Williams' conversation with Spencer. And, another surveillance team of law enforcement officials listened from a van parked in a near-by parking lot.
Officer Williams reported for roll call at 12:00 midnight as scheduled. Agent Hitchins and the two other officials carried the package to a cafeteria on the compound and hid in the cafeteria. At approximately 12:40 a.m., Officer Williams got Ferrall Spencer out of the cage and escorted Spencer to the dining hall. Williams took a few steps, retrieved the package from a table top and gave it to Spencer. Agent Hitchins was positioned behind Williams and Spencer, and from his position he could see everything. At this point the lights were still off in the dining hall, but there was a considerable amount of outside light which reflected inside. Inmate Spencer gave Officer Williams $200.00 and then proceeded to open the package. When Spencer got to the cocaine, he immediately noticed that he had been shorted three bags of cocaine and started asking about the rest of his cocaine.[2] When Agent Hitchins and company heard Spencer begin complaining about being shorted, they stepped from their hiding position, hit the lights and arrested Spencer on the spot. Both Agent Hitchins and Williams stated that Spencer was holding the vial containing the cocaine in his left hand when Agent Hitchins and the others stepped from behind a wall and arrested Spencer.
Additionally, Officer Williams testified that, to his knowledge, no one else was involved in the cocaine smuggling. In other words, he dealt only with Spencer on this occasion and had no other conversations with anyone else.
For his defense, Spencer put on inmate Randy Green. Green had been Spencer's inmate neighbor for two or three years. Green is serving a life sentence for murder. The State of Texas is waiting to take custody of Green for convictions of capital murder, murder, and armed robbery upon his release in Mississippi. Green testified that the entire smuggling plan was his idea. According to Green, the cocaine was for his *1386 own personal consumption and he used Spencer as a conduit. Inmate Green stated that Officer Williams was supposed to bring the cocaine to him, not Spencer, and that he had at least three conversations with Williams to this effect. Green stated he was responsible for having the package sent, and his testimony was that Spencer wanted no part of the plan when Spencer learned that cocaine was involved. Green said that he threatened Spencer to get him to follow through with the plan. Randy Green also stated that the $200.00 used to pay Williams came from him.[3]
Ferrall Spencer testified on his own behalf. Spencer stated that he got involved only when Officer Williams passed along an address for Spencer to give to Green. This address was supposed to be the address where Officer Williams wanted the package delivered. Spencer stated he wanted no part in the deal when he later learned that cocaine was involved, but he followed through because he was afraid that Green would hurt him.
Further, Spencer testified that when the narcotics officers appeared from behind the wall and made the arrest, he did not have the cocaine in his hand. He alleged that he did not touch the cocaine. "I never touched the box on the table. It was still on the table when he came out." He also stated that he did not pay Officer Williams the $200.00 smuggling fee.

I. DID THE TRIAL COURT ERR IN OVERRULING SPENCER'S MOTION TO DISMISS IN THAT HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WAS DENIED?

PROCEDURAL FACTS
Ferrall Spencer was arrested on April 23, 1988. He was indicted in June of 1988 by the grand jury, and the indictment was filed of record on September 29, 1988. Arraignment occurred on April 24, 1989.[4] Thus, arraignment occurred one year and one day after the arrest. On the same day of arraignment, April 24, 1989, Spencer was appointed counsel. Once appointed, Spencer's trial counsel did not delay representation and immediately filed discovery motions and a motion for continuance. An order granting the continuance was entered on June 8, 1989. Trial commenced on October 12, 1989. Spencer made his first demand for a trial on October 11, 1989, at a pre-trial hearing held one day prior to trial.

ANALYSIS
The right to a speedy trial has been described as a "vague concept" compared to other procedural rights making it impossible to determine with precision when the right has been violated. Barker v. Wingo, 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972). Additionally, application of the right is made even more troublesome in light of the fact that the remedy for its violation, dismissal of the indictment, is serious and extreme. Barker, 407 U.S. at 522, 92 S.Ct. at 2187. Be that as it may, we approach Spencer's claim with considerable guidance from this Court in numerous instances wherein the question has been presented for our review.
The constitutional right to a speedy trial attaches and begins to run "at the time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge." Handley v. State, 574 So.2d 671, 674 (Miss. 1990) (quoting Lightsey v. State, 493 So.2d 375, 378 (Miss. 1986)). Accord Vickery v. State, 535 So.2d 1371, 1376 (Miss. 1988); Beavers v. State, 498 So.2d 788, 789-91 (Miss. 1986); Perry v. State, 419 So.2d 194, *1387 198 (Miss. 1982). Thus, for constitutional purposes, the right to a speedy trial attaches and time begins to run with arrest. Handley v. State, 574 So.2d 671, 674 (Miss. 1990); Smith v. State, 550 So.2d 406, 408 (Miss. 1989). Therefore, Spencer's Sixth Amendment right to a speedy trial began running on April 23, 1988, which was the date of his arrest.
Analysis of the constitutional right to a speedy trial involves the application of a balancing test set forth in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Barker v. Wingo identified four factors to consider while recognizing that other considerations would likewise be pertinent:
We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.
Barker v. Wingo, 407 U.S. 514, 533, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972).
The four considerations which Barker specifically addressed include: (1) length of the delay; (2) reason for the delay; (3) defendant's timely assertion of his right to a speedy trial; and (4) resulting prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. at 2192.

BARKER FACTORS APPLIED TO SPENCER

I. Length of the Delay.
This first step under Barker, the length of the delay, operates as a "triggering mechanism." Smith v. State, 550 So.2d 406, 408 (Miss. 1989). If the delay is not presumptively prejudicial, then there is no need for further inquiry. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). For Spencer, the time between arrest and trial was 536 days, slightly over seventeen (17) months. This Court has recognized that a delay of eight (8) months or more is presumptively prejudicial. Smith v. State, 550 So.2d 406, 408 (Miss. 1989) (citing 2 W. LeFave & J. Israel, Criminal Procedure § 18.2 (1984), quoting Joseph, Speedy Trial Rights in Application, 48 Fordham L.Rev. 611, 623 n. 71 (1980)). See also United States v. Greer, 655 F.2d 51, 53 (5th Cir.1981) (357 days is prejudicial); Beavers v. State, 498 So.2d 788, 790 (Miss. 1986) (423 days is presumptively prejudicial); Bailey v. State, 463 So.2d 1059, 1062 (Miss. 1985) (298 days requires Barker balancing test). For Spencer, a 536 day delay is presumptively prejudicial, and inquiry into other Barker factors is required.

II. Reason for the Delay.
No reason for this delay appears in the record, a fact conceded by the State. However, there is one fact which sheds a little light on this question.
Spencer asked for a continuance, which was granted on June 8, 1989. Delays attributable to the defendant toll the running of time. Vickery v. State, 535 So.2d 1371, 1375 (Miss. 1988); Perry v. State, 419 So.2d 194, 199 (Miss. 1982). Thus, Spencer should be charged with all time between June 8, 1989, and the commencement of trial, October 12, 1989. This leaves us with a total of 410 days (536 days minus 126 days equals 410 days). Where the prosecution fails to show good cause for the delay, this factor is weighed against the prosecution. Handley, 574 So.2d at 676; Perry, 419 So.2d at 199. Here, 410 "days worth" of delay is weighed against the State.

III. Defendant's Assertion of His Right to a Speedy Trial.
The third factor in the equation is afforded "strong evidentiary weight." Barker v. Wingo, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). "We emphasize *1388 that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 532, 92 S.Ct. at 2193. See Adams v. State, 583 So.2d 165, 169 (Miss. 1991) (failure of defendant to request trial is important part in speedy trial analysis).
Spencer's first and only assertion of his right to a speedy trial came only one day prior to trial, October 11, 1989. This was 535 days following arrest. Beavers v. State recognizes that a defendant has no duty to bring himself to trial. Beavers v. State, 498 So.2d 788, 791 (Miss. 1986); Nations v. State, 481 So.2d 760, 761 (Miss. 1985); Turner v. State, 383 So.2d 489, 491 (Miss. 1980). Further, the right to a speedy trial is not waived by silence. Barker v. Wingo, 407 U.S. 514, 526, 527, 92 S.Ct. 2182, 2189, 2190, 33 L.Ed.2d 101 (1972). HOWEVER, this does not mean that the defendant has no responsibility to assert his right. Barker, 407 U.S. at 528, 92 S.Ct. at 2191. See Bailey v. State, 463 So.2d 1059, 1063 (Miss. 1985) Perry v. State, 419 So.2d 194, 199 (Miss. 1982). The third Barker factor weighs against Spencer.

IV. Prejudice to the Defendant.
Barker identified three elements of prejudice to be considered: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; (iii) to limit the possibility that the defense will be impaired. Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972). The first two elements are not applicable to Spencer. First, there was no risk of oppressive pretrial incarceration since Spencer was already in the State's custody for other, wholly unrelated reasons. Second, Spencer could hardly wage a credible argument that he experienced any significant anxiety given his already existing predicament of serving time in the penitentiary. However, what about the impairment to Spencer's defense?
At the pretrial hearing, the following exchange occurred between Spencer; his attorney, Mr. Briscoe; the prosecutor, Miss Bridges; and the trial judge:
BY THE COURT: I don't see any merit in your Motion. I have considered it and read it and take as confessed everything you say in it is true. The Motion will be denied.
BY MR. BRISCOE: Yes, Your Honor.
BY THE COURT: All right. I just don't see he suffered anything and I'm going to deny the Motion. All right.
BY MR. SPENCER: Well ... well my witness was available at the time.
BY THE COURT: Yes, sir, I understand that, but the Court has ruled and that's the ruling of the Court.
BY MISS BRIDGES: The State would be happy to try to locate any witnesses you may need to call.
BY THE COURT: If you can name them and give the ... the Court will have them brought here.
BY MR. SPENCER: Some are discharged and I have no way of getting in touch with them. It has been a year and a half since I was originally charged, arrested and charged.
BY THE COURT: Well have you given your attorney a list of them?
BY MR. SPENCER: No, I haven't. I gave him the ones .. . a list of the ones that I know. One was down in Greene County.
BY THE COURT: Well the State ... the State can find them. Y'all should have done that earlier, too.
While Spencer makes a veiled reference to the unavailability of some witnesses, he is unresponsive to the court's insistence that the State can procure any witness that he might need. We also think that it is significant that from the time Spencer obtained counsel until the trial itself, over five (5) months had passed. This was more than sufficient time for him to procure attendance of his witnesses.
It is also helpful to examine the defense which Spencer waged at trial. Obviously, *1389 the jury rejected Spencer's defense. His only witness, inmate Randy Green, seemed to impeach his own testimony. Green first stated that Officer Williams had no need or business to contact Spencer with the smuggled cocaine, and he could not understand why Officer Williams involved Spencer in the plan. Then Green stated that it was his idea to use Spencer as a conduit for smuggling in the drugs. Additionally, either Spencer or the arresting officers had to be untruthful concerning Spencer's possession of the cocaine. At trial, Spencer adamantly denied that he ever touched the cocaine. The testimony offered by the State and Spencer can not be reconciled, thereby creating a classic jury question which was resolved against Spencer. Therefore, considering all relevant factors which might bear on the fourth inquiry of prejudice to the defendant, only one logical conclusion can be drawn. Spencer experienced no prejudice.
Balancing the four factors in light of all of the circumstances, Spencer was not denied his constitutional right to a speedy trial. While the first two factors would weigh in Spencer's favor, the third and fourth factors are substantially compelling to the contrary.
As noted in the recent case of Folk v. State, 576 So.2d 1243 (Miss. 1991), our legislature has enacted what is known as "the 270 day rule."
The problem of delays in the processing and prosecution of criminal charges has plagued this nation for many years. Society, as well as the accused, suffer when indictments lie idle on the docket. Constitutional speedy trial guarantees, so elastic in their language and judicially encrusted balancing tests, are difficult of principled and effective enforcement. In the late 1960's and early 1970's, the several states began adopting specific, fixed cut-off dates within which criminal cases must be brought to trial. In the wake of this nationwide activity, our legislature enacted the 270 day rule, one of the more lenient in the country.
Folk v. State, 576 So.2d 1243, 1245 (Miss. 1991).
Our 270 day rule provides as follows:
Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy days (270) days after the accused has been arraigned.

Miss. Code Ann. § 99-17-1 (Supp. 1991) (emphasis added).
Simply put, the state has 270 days after the date of arraignment to bring the defendant to trial. Like the constitutional speedy trial analysis, any delay attributable to the defendant tolls the running of time. Handley v. State, 574 So.2d 671, 674 (Miss. 1990). Also, continuances duly granted toll the running of time unless the record is silent concerning the reason for delay. Handley, 574 So.2d at 674. Where the record is silent, the time is counted against the State. Handley, 574 So.2d at 674 (citing Vickery v. State, 535 So.2d 1371, 1375, 1377 (Miss. 1988)).
The day of arraignment is not counted, but the trial date is included as well as intervening weekends unless the 270th day falls on a Sunday or a holiday. Handley v. State, 574 So.2d 671, 674; Ransom v. State, 435 So.2d 1169 (Miss. 1983); Parkman v. Mississippi State Highway Comm'n, 250 So.2d 637, 639 (Miss. 1971). Spencer was arraigned on April 24, 1989, and trial commenced on October 11, 1989. The time between arraignment and trial is 171 days. However, Spencer's motion for a continuance was granted on June 8, 1989. The lapse of time between June 8, 1989 and the date of trial, time attributed to Spencer, is 126 days. Thus, after this time is deducted,[5] Spencer is left with a delay of only 45 days between the time of arraignment *1390 and trial. Consequently, Spencer falls well within the statutory speedy trial rule of 270 days, and we view the State's compliance with § 99-17-1 as significant when applying the four factors under Barker. We hasten to add that our jurisprudence acknowledges that long delays between the time of arrest and arraignment have the potential to violate the defendant's constitutional right to a speedy trial as analyzed by the Barker factors even though the 270 day mandate of § 99-17-1 has been met. See Perry v. State, 419 So.2d 194, 198 (Miss. 1982) (where § 99-17-1 proves inadequate, Court must protect constitutional guarantees); Davis v. State, 406 So.2d 795, 798-99 (Miss. 1981) (emphasized importance of early arraignment). However, such is not the result in the case at bar wherein the defendant suffered no prejudice and did not make his demand for a speedy trial until the eve of trial itself.
Finally, we take this opportunity to note a proliferation of appeals in the past year and a half which have raised violation of the right to a speedy trial as error in the court below.[6] While the courts of this State are always open to its citizenry for the redress of all wrongs,[7] we find the following quote from Barker is helpful to distinguish the right to a speedy trial from other fundamental constitutional rights of the accused:
A second difference between the right to a speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to a speedy trial does not per se prejudice the accused's ability to defend himself.
Barker v. Wingo, 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972).

CONCLUSION
For the reasons stated in this opinion, we find that there has been no constitutional or statutory violation of Ferrall Spencer's right to a speedy trial. Suffice it to say that we have reviewed Spencer's two remaining assignments of error and likewise find them to be without merit. We therefore affirm Spencer's conviction for possession of cocaine and sentence of three (3) years in the custody of the Department of Corrections, $10,000.00 fine and court costs.
AFFIRMED.
HAWKINS, P.J., PITTMAN and McRAE, JJ., concur.
ROBERTSON, J., concurs by separate written opinion.
SULLIVAN, J., concurs in part and dissents in part by separate written opinion, joined by ROY NOBLE LEE, C.J., PRATHER and ROBERTSON, JJ.
BANKS, J., concurs by separate written opinion, joined by ROY NOBLE LEE, C.J., and joined in part by SULLIVAN, J.
ROBERTSON, Justice, concurring:
I concur in today's judgment and am *1391 reluctant to write again[1] on the subject of speedy trial, though there is much near the end of the Court's opinion I find disquieting, if not downright indefensible. Beyond this, Justice Sullivan has written, pinpointing today's twin departures from our past jurisprudence: (1) saddling the accused with a heavy burden to demand a speedy trial on pain of waiver, and (2) tying constitutional analysis to our statutory 270-day rule case law, which, of course, puts the cart before the horse. I agree with what Justice Sullivan says, join his opinion, and will try not to be repetitious.
Today's is another successful battle in this Court's increasingly successful war against the right to a speedy trial. This and other recent cases convince me the Court is determined to find a way to finesse all but the clearest speedy trial claims. The majority fails to see language like today's serves but to exacerbate the problem of criminal justice delay without measurable compensating gains. The people at large have an interest in prompt criminal prosecutions. That the people's interest is not reflected in a constitutional right does not preclude the courts regarding it. There certainly is no legal preclusion.
Every rule of law incites behavior. The reason we have law is to curb conduct thought undesirable and that we doubt we can curb without it. We have and enforce other laws to afford incentives to that which makes social life on the whole more tolerable. How well law serves us is a function of the intelligence of our judicial stewardship. Because we are fallible, we do not always effect what we desire. We look out the window but here, as so often, we fail to see without passion or prejudice.
The end immediately at issue is prompt disposition of criminal charges, a consummation devoutly to be wished by the public at large as well as the (innocent) accused, as Barker says as well as any case I know. Barker v. Wingo, 407 U.S. 514, 519-20, 92 S.Ct. 2182, 2186-87, 33 L.Ed.2d 101, 110-11 (1972). Our war on the Sixth Amendment does not serve well that end, and why this is so should be apparent. Trial judges and prosecutors, no less than (would-be) offenders respond to law's deterrent. "A rule that is not enforced is no rule." Box v. State, 437 So.2d 19, 21 (Miss. 1983). Infinitely more important, a rule that is not enforced will not be followed, and the behavior it ought deter will continue.
Delay is rampant in our criminal justice system, and if we start enforcing the Sixth Amendment (not to mention our own Constitution) and do so firmly and consistently, it just might stop, but it certainly will not stop until then. Instead, in footnote 6 the majority takes a broadside swipe at those who would assert speedy trial claims. The Court sends signals that it considers such claims a nuisance, and looks upon them with distaste. When we say so firmly we will find a way to avoid reversing on speedy trial claims, we tell our trial courts and our prosecuting attorneys that they may relax their Sixth Amendment diligence. So long as they avoid the statute-of-limitations-like 270-day rule, they have nothing to fear. We forget our recent experience in the area of criminal discovery. It took a few reversals in cases of clearly guilty criminals and a few missteps in rule and reasoning, but few today would deny it was worth it. We have substantially enhanced the fairness of criminal trials through full and free discovery, without discernible adverse impact upon our ability to convict the guilty. What the Court fails to understand is that it may well win the war against the right to a speedy trial, but with the consequence that everybody loses. For this is one instance where constitutional imperative and the public interest completely coincide.
If there were a compensating gain I might pause. The only laudable gain one might consider is that, through our persistent rebuff of speedy trial claims, fewer *1392 criminals will go free, and the general deterrent capacity of the criminal law will be enhanced accordingly. But the distance from denial of speedy trial claims to a lowered crime rate is great. Any incentives diffuse and dissipate well short of their mark. The gain is thus seen ephemeral. On the other hand, five years unflinching enforcement of speedy trial rights and a steady course thereafter will as surely as the night follows the day produce prompt prosecutions, presuming, of course, the public wants prompt prosecutions enough to pay the piper.
I concede the delays at the appellate level are intolerable as well and that, in a sense, any complaint here at delay at the trial level bespeaks of the pot calling the kettle black. But there is one fundamental difference. The defendant on appeal has been shorn of his presumption of innocence. The convicted defendant has either begun serving his time or has provided costly security assuring the public that he will surrender upon affirmance.
There is a more legalistic point. An accused has no duty to bring himself to trial. Barker v. Wingo, 407 U.S. at 527, 92 S.Ct. at 2190, 33 L.Ed.2d at 115. We have repeatedly accepted this premise. See, e.g., State v. Ferguson, 576 So.2d 1252, 1255 (Miss. 1991); Flores v. State, 574 So.2d 1314, 1318 (Miss. 1990); Jaco v. State, 574 So.2d 625, 632 (Miss. 1990); Vickery v. State, 535 So.2d 1371, 1377 (Miss. 1988); Williamson v. State, 512 So.2d 868, 877 (1987); Fisher v. State, 532 So.2d 992, 996 (Miss. 1988); Reed v. State, 506 So.2d 277, 281 (Miss. 1987); Nations v. State, 481 So.2d 760, 761 (Miss. 1985); Turner v. State, 383 So.2d 489, 491 (Miss. 1980). Today's majority repeats the words and, as well, Barker's admonition that the right to a speedy trial is not lost by silence, Barker v. Wingo, 407 U.S. at 526-527, 92 S.Ct. at 2189-90, 33 L.Ed.2d at 114, though a moment later they vanish like the wind.
Candor requires concession that today's is hardly our first speedy trial case where we give lip service to these ideas and then promptly ignore them. Today we weigh Spencer's failure to assert the right until the day before trial "heavily against" him. But this is not the way rights work. We would never say an accused's failure to take the witness stand at trial weighs heavily against him, and, indeed, if the defendant wishes, he may have instruction to the contrary. Incident to a plea bargain, we do not presume from a silent record waiver of the right to counsel, the right to trial by jury, nor the right to confront witnesses. See Boykin v. Alabama, 395 U.S. 238, 242-44, 89 S.Ct. 1709, 1711-12, 23 L.Ed.2d 274, 279-80 (1969), followed and respected in this state in cases from Phillips v. State, 421 So.2d 476, 479 (Miss. 1982), down through most recently Horton v. State, 584 So.2d 764, 767 (Miss. 1991). Barker says all of this much better than I am saying it. Barker, 407 U.S. at 526-27, 92 S.Ct. at 2189-90, 33 L.Ed.2d at 114-115.
I join in affirmance because I think on today's facts the Circuit Court sensitively assessed the Barker factors and held the accused had suffered no loss of his rights. State v. Ferguson, 576 So.2d 1252, 1255 (Miss. 1991). I find little in the majority opinion to fuss about until we reach the bottom of Section III, page 1388, when in complete contradiction of what has been said before, the Court says, "The third Barker factor weighs heavily against Spencer." What follows thereafter is but symptomatic of what we see so often, that we are ready and willing to respect those rights of the criminally accused that are seldom violated, where waivers are easily obtained, or that otherwise infrequently inconvenience us. When we follow this course, we invariably produce greater public inconvenience, for there are none so blind as those who will not see.
SULLIVAN, Justice, concurring in part and dissenting in part:
I agree that this conviction should be affirmed and that Spencer's constitutional and statutory rights to a speedy trial were not violated. Because I believe the majority *1393 opinion would launch this Court on a new course in the area of speedy trial law, I write separately to explain my disagreement with other conclusions offered by the majority opinion.
I would not, as the majority did, weigh heavily against Spencer his failure to timely assert his right to a speedy trial, nor would I find that compliance with the statutory 270-day rule is in any way a significant factor in determining whether Spencer's constitutional guarantee has been met.
An accused's assertion of his right to a speedy trial is one of four considerations used to determine whether the constitutional right to a speedy trial has been met. Flores v. State, 574 So.2d 1314, 1322 (Miss. 1988) [citing Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972)]. We consider this factor because although the State has the primary duty to ensure that a defendant receives a speedy trial, a defendant also has some responsibility to assert his right. Wiley v. State, 582 So.2d 1008 (Miss. 1991) [citing Flores v. State, 574 So.2d 1314, 1323 (Miss. 1990)]; Trotter v. State, 554 So.2d 313, 317 (Miss. 1989) [citing Barker v. Wingo, 407 U.S. at 529, 92 S.Ct. at 2191]. Heretofore, if a defendant failed to assert his right to a speedy trial, we weighed this factor against him "only lightly, if at all." Flores, 574 So.2d at 1323; Trotter, 554 So.2d at 317.
Spencer was not appointed counsel until a year and a day after his arrest. As noted by the majority, Spencer, prior to having counsel appointed, could have demanded a speedy trial. This assumes that Spencer knew that he had a right to a speedy trial and to whom he should make a demand. Logic suggests that the one purpose of having counsel appointed is to ensure that an accused is aware of his rights, including his right to a speedy trial.
In a recent case, we found that a defendant's failure to assert his right to a speedy trial until the day before trial would not be weighed against the defendant because the defendant "was practically without representation because of the changes in his attorney." Wiley, supra. Wiley is distinguishable because Spencer was appointed counsel at his arraignment, 171 days prior to trial. Therefore, I would not find, as in Wiley, that the accused's failure to assert his right should not be weighed at all against the defendant. However, I would weigh the failure only lightly against the defendant. The majority, contrary to precedent, weighs it heavily against the defendant and that is not the law in this jurisdiction. Spencer's failure to assert his right to a speedy trial until the eve before trial should be weighed against him "only lightly."
After concluding that under the Barker factors Spencer's constitutional right to a speedy trial was not violated, the majority adds that it also finds significant in its analysis the fact that there was no violation of the 270-day rule. The majority concedes that the constitutional right to a speedy trial and the statutory right to a speedy trial are not one and the same, and that long delays between the time of arrest and arraignment have the potential to violate a defendant's right to a speedy trial even though the 270-day rule is met. But then, despite the fact that over a year elapsed between Spencer's arrest and arraignment, the majority concludes that compliance with the statutory 270-day rule is a significant factor in determining whether Spencer's constitutional guarantee has been met.
This Court has not heretofore adhered to such a rule, see Smith v. State, 550 So.2d 406, 408 (Miss. 1989) (cites omitted); Bailey v. State, 463 So.2d 1059, 1062 (Miss. 1985); Perry v. State, 419 So.2d 194 (Miss. 1982), and this case represents a prime reason why the Court should not now adopt one. When over a year elapsed after Spencer was arrested before the 270-day period even began to run, how can compliance with the 270-day rule have any bearing on whether Spencer's constitutional right to a speedy trial was met? Clearly it does not. One right runs from the date of arrest, the *1394 other from the date of arraignment. The two are separate and distinct, and should remain so.
The majority also attempts to "place the constitutional right to a speedy trial in the proper perspective" by quoting from Barker, supra, that a long delay may actually benefit the accused, and therefore is not per se prejudicial. The majority ignores the fact that despite any advantage stemming from a lapse of time between arrest and trial, many defendants prefer an early trial. As noted by the United Supreme Court in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), "the major evils protected against by the speedy trial guarantee exist apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." United States v. Marion, 404 U.S. at 320, 92 S.Ct. at 463; see also, Barker v. Wingo, 407 U.S. at 537, 92 S.Ct. at 2195 (White, J., concurring). The proper perspective is for this Court to continue its recognition that the constitutional right to a speedy trial is a fundamental right which, because of its amorphous nature, requires a balancing of the particular circumstances of a particular case.
ROY NOBLE LEE, C.J., PRATHER and ROBERTSON, JJ., join this opinion.
BANKS, Justice, concurring:
I concur in the result reached by the majority. I write also to note that I concur as well with Justice Sullivan that within the peculiar context of this particular case, Spencer's failure to assert his right to speedy trial during the period between his arrest and his appointment of counsel should not be weighed heavily against him. See, Trotter v. State, 554 So.2d 313, 317 (Miss. 1989). Whether this factor is weighed heavily or lightly, in this case the result should be the same. Ordinarily, however, such a failure should weigh heavily against a defendant seeking discharge for violation of his right to a speedy trial. Adams v. State, 583 So.2d 165 (Miss. 1991).
This comports with Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and common sense. We do not say that the right is waived by the failure to assert it. Oppressive conduct on the part of the state or actual prejudice to the defendant may be of sufficient weight to overcome the failure to assert the right. Similarly, there may be circumstances where the failure to assert the right is mitigated. See, Trotter, supra. It would be folly, however, to ignore the fact, recognized by the Barker court, that often delay is the criminal defendant's ally. While the public may have a valid interest in swift justice, expanding the criminal defendant's right to speedy trial beyond what is necessary to protect the core value of that individual right is a poor way to serve that interest.
I also agree with what Justice Sullivan has written with regard to the application of the 270-day rule to the analysis of the constitutional guarantee to a speedy trial.
ROY NOBLE LEE, C.J., joins in this concurring opinion.
SULLIVAN, J., concurs in part.
NOTES
[1] Officer Williams was charged with possession of cocaine. He no longer works at Parchman as a correctional officer.
[2] The package originally contained four bags of cocaine, called eight balls. Agent Hitchins had removed three bags and left only one bag in the tennis shoes. Apparently, this was department policy in case the authorities lost control over the substance, there would be less available on the streets.

Agent Hitchins testified that an eight ball of cocaine contained about 3.5 grams. The going rate in prison was $275.00 to $325.00 for an eight ball.
[3] Inmates are not allowed to have more than $20.00. However, Green stated that he always had plenty of money from a money order scam that he ran from prison through his lonely hearts club.
[4] An attempt was made to arraign Spencer on October 4, 1988. However, the summons for his arraignment was returned to the Sheriff of Sunflower County stating that Spencer could not be found after diligent search and inquiry.
[5] One hundred seventy one (171) days minus one hundred twenty six (126) days leaves forty five (45) days.
[6] See Flores v. State, 586 So.2d 811 (Miss. 1991); Adams v. State, 583 So.2d 165 (Miss. 1991); Wiley v. State, 582 So.2d 1008 (Miss. 1991); Anderson v. State, 577 So.2d 390 (Miss. 1991); Barnes v. State, 577 So.2d 840 (Miss. 1991); State v. Ferguson, 576 So.2d 1252 (Miss. 1991); Folk v. State, 576 So.2d 1243 (Miss. 1991); Flores (Van Etten) v. State, 574 So.2d 1314 (Miss. 1990); Handley v. State, 574 So.2d 671 (Miss. 1990); Jaco v. State, 574 So.2d 625 (Miss. 1990); Galloway v. State, 574 So.2d 1 (Miss. 1990); Yarber v. State, 573 So.2d 727 (Miss. 1990); Mitchell v. State, 572 So.2d 865 (Miss. 1990); Moore v. State, 556 So.2d 1031 (Miss. 1990).
[7] See Miss. Const. art. III, § 24.
[1] See, e.g., Adams v. State, 583 So.2d 165, 170 (Miss. 1991) (Robertson, J., dissenting); Kinzey v. State, 498 So.2d 814, 819 (Miss. 1986) (Robertson, J., dissenting).