885 So.2d 72 (2004)
Deondray JOHNSON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2002-KA-01800-COA.
Court of Appeals of Mississippi.
March 30, 2004.
Rehearing Denied July 27, 2004.
Certiorari Denied October 28, 2004.
*75 Deondray Johnson, pro se.
Raymond M. Baum, Winona, attorneys for appellant.
Office of the Attorney General by W. Glenn Watts, attorney for appellee.
Before KING, P.J., LEE and CHANDLER, JJ.
KING, P.J., for the Court.
¶ 1. Deondray Johnson was tried and convicted of capital murder by the Circuit Court of Attala County. Johnson was sentenced to life imprisonment without parole in the custody of the Mississippi Department of Corrections. Aggrieved by his conviction Johnson appeals and states his issues as follows.
I. Whether the trial court committed reversible error when it overruled the defendant's Motion to Dismiss for violation of right to speedy trial.
II. Whether the trial court abused its discretion in refusing to grant a new trial in this cause because the verdict was against the overwhelming weight of the evidence.
¶ 2. Finding no merit in these issues, this Court affirms.

STATEMENT OF FACTS
¶ 3. Dorothy Broome Jordan owned and operated Dot's Bar and Grill adjacent to her home in rural Carroll County. While returning home from work in the early morning hours of January 21, 2001, Jordan was accosted in her front yard by an assailant or assailants wielding a piece of wood, and was beaten to death. Jordan's body was then dragged inside her home and a gun and cash were stolen from her residence. Jordan's neighbors discovered her body lying in the floor the next morning when they attempted to rouse her in order to purchase cigarettes from her store.
¶ 4. The Carroll County Sheriff's Department was notified and began an investigation. That investigation revealed that on January 21, a crowd had assembled at Dot's Bar and Grill for the usual activities of drinking, playing cards, and using the gambling machines. In that group were Deondray Johnson and his cousin Lawrence Branch. Johnson and Branch took two of the club's patrons home, and were to return to pick up Johnson's mother, Janie Johnson, and Anthony Hayes. Because Johnson and Branch never returned, Jordan took Janie Johnson and Anthony Hayes to Janie Johnson's home about five miles away.
¶ 5. Upon her return home, Jordan was killed. Johnson and Branch were questioned by sheriff's deputies about her murder. Johnson waived his Miranda rights and denied any involvement in the murder. The home Johnson shared with his mother was searched and no incriminating evidence was found.
¶ 6. Branch was Johnson's next door neighbor, living in a trailer next to his parents' house. Branch's father found a black plastic garbage bag in his yard and turned it and its contents over to the Carroll County Sheriff's Office. Inside the black garbage bag were two white plastic Exxon bags. Inside these bags was a .38 Rossi revolver, some currency and food stamps. The pistol was determined to be Jordan's, and Johnson's fingerprints were found on one of the $1.00 food stamps.
¶ 7. On Monday January 23, 2001, Johnson was arrested. The deputies who arrested Johnson noticed what looked like spatters of blood on the hem of his black jeans and on one of the tennis shoes he was wearing. When questioned, Johnson admitted he had been wearing the clothes on the night of Jordan's murder. The *76 clothes were removed from Johnson and sent to be processed by a DNA analyst. The DNA analyst determined that the spatter on Johnson's jeans and tennis shoes was blood, and that it matched the DNA genetic profile of Dorothy Jordan.
¶ 8. On April 26, 2001, Johnson and his cousin, co-defendant Lawrence Branch, were indicted for the murder of Dorothy Jordan while engaged in the felony of robbery. On May 1, 2001, Johnson was arraigned in the Circuit Court of Carroll County for capital murder.
¶ 9. At an October 24, 2001 motion hearing, it was suggested that Branch be tried first. The trial judge also entered an order setting the date for the trial of the first defendant, Branch, for March 2, 2002, and the trial for the second defendant, Johnson, for March 25, 2002. A few days later on October 30, 2001, Johnson filed a motion demanding a speedy trial. However, that motion was never pursued.
¶ 10. Branch's trial was slated to begin on March 2, 2002. However, on February 13, 2002, Branch requested a mental evaluation, which was completed on March 11, 2002. Sometime in February, Branch's attorney requested that Branch be deemed indigent and co-counsel be appointed. The trial judge granted the request, and granted Branch's requested continuance. Branch's trial was re-scheduled for May 20, 2002.
¶ 11. On May 23, 2002, Branch was convicted in the Circuit Court of Carroll County of capital murder and received the death penalty. On May 29, 2002, Johnson filed a motion for change of venue, which was granted. Venue was transferred to Attala County and the trial date was set for September 30, 2002. On September 27, 2002, Johnson filed a motion to dismiss for violation of the right to a speedy trial, which was denied.
¶ 12. On October 3, 2002, the jury convicted Johnson of capital murder. The jury was unable to reach a unanimous verdict in the sentencing phase, and the trial judge sentenced Johnson to life in prison without the possibility of parole.

ISSUES AND ANALYSIS

Whether the trial court committed reversible error when it overruled the defendant's Motion to Dismiss for violation of right to speedy trial
¶ 13. Johnson asserts that the trial court erred in overruling his motion to dismiss the case for violation of his right to a speedy trial guaranteed by the Sixth Amendment and Fourteenth Amendment to the United States Constitution and by article 3, § 26 of the Mississippi Constitution of 1890. Johnson also argues that the violation of his statutory right to a speedy trial, specifically Mississippi Code Annotated Section 99-17-1 (Rev.2000), which requires that a defendant's trial begin within 270 days of arraignment, required dismissal of the charges against him.
¶ 14. We begin our analysis with the constitutional issues. A criminal defendant's right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article 3, § 26 of the Mississippi Constitution of 1890. "When a defendant's constitutional right to a speedy trial is at issue, the balancing test set out in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is applicable." Noe v. State, 616 So.2d 298, 300 (Miss.1993). Speedy trial issues are analyzed by applying the four factors detailed in Barker which include (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant was prejudiced by the delay. Skaggs *77 v. State, 676 So.2d 897, 900 (Miss.1996) (citations omitted). No single factor controls. Id. Furthermore, the court is not strictly limited to consideration of the Barker factors. State v. Magnusen, 646 So.2d 1275, 1278 (Miss.1994). Alleged violations of the right to a speedy trial are decided on a case by case basis, weighing the facts and circumstances and the conduct of the prosecution and the defense. Elder v. State 750 So.2d 540, 542(¶ 7) (Miss.Ct.App.1999), citing McGhee v. State, 657 So.2d 799, 804 (Miss.1995); Giles v. State, 650 So.2d 846, 851 (Miss.1995).
¶ 15. To determine whether Johnson's rights were violated this Court examines the Barker factors within the context of this case.

A. Length of Delay
¶ 16. "The supreme court has held that the right to a speedy trial under the United States Constitution attaches immediately upon the defendant's arrest." Elder v. State, 750 So.2d 540, 545 (¶ 10) (Miss.Ct.App.1999), citing Box v. State, 610 So.2d 1148, 1150 (Miss.1992). The Court has also held that after the defendant's arrest a delay of more than eight months before trial is presumptively prejudicial to the defendant, and violative of his right to a speedy trial. Id., citing Spencer v. State, 592 So.2d 1382, 1387 (Miss.1991); Smith v. State, 550 So.2d 406, 408 (Miss.1989). This presumption can be rebutted by balancing the remaining Barker factors. Handley v. State, 574 So.2d 671, 676 (Miss.1990).
¶ 17. To place this issue into perspective, this Court includes the following chronology of events beginning with Johnson's arrest on the capital murder charge and ending with his trial and subsequent conviction.

 April 26, 2001 Indicted on capital murder charge
 May 1, 2001 Arraigned on capital murder charge
 October 24, 2001 Agreement in the record between Johnson and prosecutor that
 co-defendant Branch would be tried first
 October 24, 2001 Order setting trial for first defendant for March 4, 2002 and for
 second defendant for March 25, 2002
 October 30, 2001 Demand for speedy trial filed
 May 23, 2002 Co-defendant Branch found guilty of capital murder and sentenced
 to the death penalty
 May 29, 2002 Motion for change of venue filed and granted by judge
 July 16, 2002 Order entered transferring venue
 September 26, 2002 Motion to dismiss for violation of right to speedy trial filed by
 Johnson
 September 30, 2002 Trial begins on capital murder charge
 October 3, 2002 Johnson convicted of capital murder

¶ 18. Johnson was arrested and charged with capital murder on January 23, 2001, but was not tried for the offense until September 30, 2002. As 614 days elapsed, approximately 20 1/2 months, between the arrest and the trial, the delay in the present case is presumptively prejudicial and triggers consideration of the other Barker factors.

B. Reason for Delay
¶ 19. Johnson simply argues that the reason for the delay should be attributed to the State unless the prosecutor can produce evidence justifying the delay and persuading the trier of fact that the delay was legitimate. Johnson does not analyze the 614 day delay in his brief, and does not show affirmatively that there was no reason for the delay. Johnson's entire argument is that the delay alone is sufficient to *78 warrant a new trial. That assertion is not a correct statement of the law.
¶ 20. The State bears the responsibility for bringing a defendant to speedy trial. Turner v. State, 383 So.2d 489, 491 (Miss.1980). However, it is only held accountable for delay caused by its actions. In its brief the State relies on the record and outlines in painstaking detail the reasons for the delay of Johnson's trial.
¶ 21. On April 26, 2001, Johnson and Lawrence Branch were indicted for capital murder of Dorothy Broome Jordan. On May 1, 2001, Johnson was arraigned on the charge of capital murder of Dorothy Broome Jordan. From May 1, 2001, until October 24, 2001, the record indicates that no activity occurred and the case was not set for trial.
¶ 22. On October 24, 2001, the prosecution and defense appeared before the trial judge and set the case for trial. At that hearing it was ascertained that DNA samples ordered by the State had not been taken from the defendants. At that time the trial court entered an order requiring that the samples be taken by November 7, 2001. At the hearing Johnson's counsel, Lee Jones, requested that Branch be tried first since he had confessed on videotape. The following dialogue is from the record:
BY MR. JONES: Realistically, tacitly speaking, I don't see that the District Attorney's office can try these together
BY THE COURT: No, they can't, it is going to be severed. The fact is have they not already been severed?
BY MR. BLECK: I think they have different cause numbers, Your Honor.
BY THE COURT: Yeah, I think they are alreadyit is automatic severance. What I am going to do....
BY MR. JONES:The way the evidence lies; that is, they have a video statement from Mr. Branch. Mr. Johnson has not given a statement. Realistically, they have got to try Branch first.
BY THE COURT: Well, I mean I
BY MR. JONES:tactically speaking
BY THE COURT: Let me just ask it this way. How long do you think it wouldif we have to try your case, how long do you think it would take?
BY MR. JONES: It depends on whether they get him or not.
BY THE COURT: Okay, I am going to set both of these cases for trial the first week in March. The DA will be required to within one week of the return of the DNA Reliagene results, whatever lab results you get, within one week well, let's make it to the DNA. Within one week of the return of the DNA results, the State must elect which case is going to be tried and notify Counsel for each defendant.
As the record indicates it was Johnson's attorney who suggested that Branch be tried first. The trial judge entered an order setting trial for the first defendant on March 2, 2002, and for the second defendant on March 25, 2002. The trial judge indicated that this later setting would allow time for the DNA test results to be returned.
¶ 23. After the DNA results were returned, the State stated that Branch would be tried first and his trial was to begin on March 2. However, On February 13, Branch filed a motion for a mental evaluation. The evaluation was completed on March 11, 2002, and Branch's case was re-scheduled for March 25. Also, sometime in February Branch's counsel requested that the trial judge declare Branch indigent and appoint additional counsel to the case which the trial judge did. After Branch's case was re-scheduled for March 25 his attorneys asked for a continuance which was granted, and the case was re-scheduled *79 a second time. The case was continued until the first week of the next Carrollton term which was the third week of May 2002. Branch was convicted of capital murder, and sentenced to the death penalty on May 23, 2002.
¶ 24. On May 29, 2002, after Branch's conviction and sentence, Johnson filed a motion for change of venue which was granted. The case was transferred to Attala County and scheduled to being on September 30, 2002.
¶ 25. On September 30 2002, Johnson was heard on a motion to dismiss for violation of the right to a speedy trial. The trial judge denied the motion and stated the following in the record:
It is being tried as promptly as the court could get to it and maintain its other dockets. Some of which consist of a four-week term in Grenada in July and August. Also, the motion for speedy trialthere has been noother than the demand being filed last week, nobody has presented it in open court requesting that the case move any faster than it has moved. Therefore I find that the case has at all times been continued by either agreement of counsel or for good cause shown and that the motion for speedy trial either on constitutional grounds or under the 270-day rule is not well taken and the same is denied.
The trial judge noted that all parties had agreed that Branch would be tried first, and Johnson had filed for a motion to transfer venue which delayed the case even more. Johnson presented no other argument on the motion except to refer the Court to the brief he filed in support of the motion of which his brief to this Court is a replica.
¶ 26. The only time that must count against the State is the period of time between Johnson's indictment and the State's retrieval of DNA evidence from him. One hundred and sixty-four days elapsed between Johnson's indictment on April 26, 2001, and the State's collecting of DNA samples from him around November 7, 2001.
¶ 27. We find there to be no deliberate procrastination by the State after the DNA was collected. Tolling the clock for the agreement that Branch be tried first on March 2, 2002, and the fact that the Mississippi Supreme Court has said that time set aside for a psychiatric evaluation does not weigh against the State, Elder v. State, 750 So.2d 540, 544 (¶ 16) (Miss.1999), and the addition of an attorney for Branch we find at most 164 days should be counted against the State for its failure to timely collect the DNA evidence. This factor is therefore weighed in favor of the State.

C. Defendant's assertion of his right to a speedy trial
¶ 28. Although it is the State's duty to insure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right. Smith v. State, 812 So.2d 1045 (¶ 11) (Miss. Ct App. 2001), citing Wiley v. State, 582 So.2d 1008, 1012 (Miss.1991).
¶ 29. Johnson filed a motion demanding a speedy trial on October 30, 2001. However, the record is devoid of any indication that this motion was ever brought before the judge for a ruling. With the exception of noting the date on which Johnson filed his demand for a speedy trial, Johnson completely fails to discuss the motion in his brief. Johnson also filed a motion to dismiss for violation of his right to a speedy trial on September 26, 2002, a few days before the case was set for trial, which was denied by the trial judge. Because Johnson did not diligently pursue a speedy trial, this factor is weighed against him.

*80 D. Prejudice to the defendant

¶ 30. "The supreme court has held that prejudice is assessed in the speedy trial context (1) to protect against oppressive pretrial incarceration, (2) for the minimization of anxiety and concern of the accused, and (3) for the limitation of the possibility of impairment of the defense." Elder v. State, 750 So.2d 540, 545 (¶ 19) (Miss.Ct.App.1999), citing Hughey v. State, 512 So.2d 4, 11 (Miss.1987). "The possibility of impairment of the defense is the most serious consideration in determining whether the defendant has suffered prejudice as a result of delay." Sharp v. State, 786 So.2d 372, 381 (¶ 19) (Miss.2001).
¶ 31. As to the first element, Johnson argues that the majority of his time while incarcerated at Carroll-Montgomery Correctional Facility in Vaiden, Mississippi was spent in lockdown or solitary confinement. The record indicates that on May 29, 2002, and September 11, 2002, Johnson's attorney told the trial judge that Johnson was being kept in isolation and solitary confinement. Johnson's attorney indicated that the warden of the facility said that Johnson was in isolation because he was considered a security risk after his co-defendant had been found guilty of capital murder and given the death penalty. The trial judge responded by stating: "He is incarcerated for capital murder. I will leave it up to the jail to decide what security measures they need. If they think he needs to be locked down, that's the way it will be."
¶ 32. As to the second element, Johnson does not elaborate but simply claims that a twenty month incarceration "would cause anyone anxiety and concern," mentioning again that a substantial amount of his 614 day incarceration was spent in lockdown or solitary confinement.
¶ 33. As to the third element Johnson argues that his continual incarceration from the time of his arrest on January 23, 2001, until his trial on September 30, 2002, was extremely detrimental to his defense. Johnson's brief states that "obviously incarceration will always affect the defendant's ability to assist counsel with the preparation of his defense." Johnson claims that his defense was impaired by the delay because a potential defense witness indicated on Johnson's response to discovery died before the trial commenced.
¶ 34. The record does not indicate the exact date of the witness's death, but on cross examination an officer in the sheriff's department, Michael Spellman, testified that the witness died shortly before Johnson's trial began.
¶ 35. Johnson claims that the testimony of the potential witness was important to his case because the witness was present at the scene on the night in question, and that this witness was the first suspect that law enforcement questioned after the murder. Johnson claims that the testimony would have shown that the witness lost money playing cards and that the victim won money on the night of the murder. Johnson does not indicate the relevance of this testimony. We can only assume that it was to establish a motive to kill Jordan. However, even in so assuming, we are unpersuaded of any prejudice to Johnson. This issue weighs against Johnson.

E. Mississippi Statutory Issues
¶ 36. Johnson claims that his conviction should be overturned because his statutory rights, under Mississippi Code Annotated Section 99-17-1 were violated. Mississippi Code Annotated Section 99-17-1 requires that a defendant's trial begin within 270 days following arraignment unless good cause be shown. Johnson argues that the prosecution did not show good cause for the delay of 518 days between his arraignment and trial.
*81 ¶ 37. As enumerated above, a significant portion of the delay in the trial was a result of the agreement between the prosecution and Johnson that his co-defendant's trial should be conducted first. There was a trial date set for March 2, 2002, for Johnson's trial before the co-defendant's attorney withdrew and he then requested a psychiatric exam. As a result, Johnson's trial was delayed. Then after his co-defendant received the death penalty Johnson was granted a motion for a change of venue which resulted in further delay due to Attala County's being a multi-member circuit it has limited number of days for circuit court each year. September 30, 2002, was the first available date for trial. While approximately 114 days can be charged to the State for its delay in collecting a DNA sample we find that good cause existed for the resulting delay.

F. Conclusion
¶ 38. Having applied the Barker factors, to the facts and circumstances of this case, we find that Johnson's constitutional and statutory rights to a speedy trial were not violated.

II.

Whether the trial court abused its discretion in refusing to grant a new trial in this cause because the verdict was against the overwhelming weight of the evidence
¶ 39. Johnson claims that the lack of any eyewitnesses, physical evidence, or other tangible proof causes the verdict to be against the overwhelming weight of the evidence. When reviewing a claim that the verdict is against the overwhelming weight of the evidence a new trial will not be ordered unless the reviewing court is convinced that "the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Elder v. State, 750 So.2d 540, 545 (¶ 22) (Miss.Ct.App.1999), citing Johnson v. State, 642 So.2d 924, 928 (Miss.1994); Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983). For the appellate court to uphold the verdict of the jury, all that is required is that an actual factual dispute was presented to the jury for determination. Elder, 750 So.2d 540 at 545, citing Groseclose, 440 So.2d at 300.
¶ 40. In his argument, Johnson also challenges the sufficiency of the evidence. The sufficiency of the evidence is challenged by motions for directed verdict or judgment notwithstanding the verdict. Elder v. State, 750 So.2d 540, 545 (¶ 23) (Miss.Ct.App.1999), citing McClain v. State, 625 So.2d 774, 781 (Miss.1993). In determining sufficiency, credible evidence must be viewed in the light most favorable to the verdict and must be accepted as true. Elder, 750 So.2d at 545, citing Wetz, 503 So.2d at 808. The reviewing court will reverse only "where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Id.
¶ 41. In his argument Johnson claims that state witness Anthony Hayes' testimony was uncontradicted that Johnson arrived home at 5:00 a.m. It is Johnson's argument that Hayes' testimony exonerates him from having committed the crime. Johnson also argues that, according to the forensic pathologist, livor mortis[1] had not *82 occurred in Jordan's body at approximately 5:00 a.m.; therefore, he could not have committed the crime. Johnson further argues that no evidence exists in the record to support a conviction of robbery.
¶ 42. The elements of robbery were established through the testimony of Carroll County Sheriff Dan Gray. Gray testified that Branch's father, Johnson's neighbor, turned over a plastic bag he found near his trailer. Inside that bag was a .38 Rossi revolver handgun, some cash, food stamps and coin wrappers. Gray testified that the revolver was positively identified as belonging to Jordan, and Johnson's fingerprint was found on one of the food stamps from inside the bag.
¶ 43. Michael Spellman of the Carroll County Sheriff's Office testified that he found a piece of wood that looked like it had hair and blood on it near Jordan's truck. Spellman also testified that he found pieces of wood close to Johnson's home that were similar in color, size, and texture to the one found at the crime scene.
¶ 44. Joe Andrews, forensic expert, testified that the two broken pieces of wood found near the crime scene matched each other indicating they were originally one piece of wood. Andrews also testified that the two pieces of wood were similar in size, texture, thickness, and grain texture to the wood found near Johnson's home.
¶ 45. Johnson admitted to sheriff's deputies that the wood could have come from his yard when he said that his cousin, Lawrence Branch, probably got the wood from his yard and that is was probably the murder weapon.
¶ 46. On January 23, the day Johnson was arrested, he admitted to sheriff's deputies that he had been wearing the same clothes since January 21, the morning of Jordan's murder. Deputies noticed a spot of blood on the hem of the jeans as well as the tennis shoes that Jordan was wearing.
¶ 47. Chris Larsen, a forensic DNA analyst, testified that the genetic material found on the wood, the jeans and the shoes Johnson was wearing were consistent with the genetic profile of Jordan. Larsen testified that the degree of consistency of the match was one in greater than 10 billion.
¶ 48. The Carroll County coroner testified that he got a call regarding Jordan's murder at 4:50 p.m. The coroner testified that he arrived on the scene, found the body lying face down and turned it over. Pictures from the scene which were admitted into evidence show a trickle of blood running down Jordan's face after her body had been turned over. The forensic pathologist who examined Jordan's body post-mortem testified. He testified that livor mortis had not set in when the coroner turned Jordan's body over as evidenced by the blood running down her face in the picture. His testimony described livor mortis as a the condition of the body post-mortem when blood sets and will not move even under pressure. The forensic pathologist also testified that livor mortis normally occurs "at about 8-10 hours."
¶ 49. All inferences must be considered in the light most favorable to the State. McClain, 625 So.2d at 781. The livor mortis argument that Johnson posits is speculative at best; as such we find no merit to this issue.
*83 ¶ 50. The evidence was sufficient and offered substantial credible evidence upon which a jury could, and did base a verdict of guilty to capital murder with the underlying felony being robbery. There is accordingly no merit to this issue.
¶ 51. THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO ATTALA COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.
NOTES
[1] Ida G. Dox, Gilbert M. Eisner, June L. Melloni, and B. John Melloni, Attorney's Illustrated Medical Dictionary, L45 (West Publishing Company 1997), Livor mortis: A reddish blue to purple coloration of the dependant, non-compressed skin surfaces of a corpse; caused by cessation of circulation and resulting gravitational settling of blood in the minute blood vessels (capillaries) just below the skin. The coloration is occasionally misinterpreted as bruising (contusion) by those unfamiliar with the phenomenon. The process begins immediately after death and usually becomes evident within two hours after death. Those areas of the body that have been in contact with a hard surface appear blanched, an important factor in determining whether the body was moved after death. Also called livor; lividity; postmortem lividity; cadaveric lividity; postmortem hypostasis.