WALLER, Chief Justice,
for the Court:
¶ 1. Cecil Ben was convicted of rape and sentenced to life imprisonment by the Circuit Court of Leake County. The Court of Appeals affirmed his conviction and sentence. We now do the same.
FACTS AND PROCEDURAL HISTORY
¶ 2. The Court of Appeals set out the facts and procedural history as follows:
On October 3, 2007, at approximately 4:30 a.m., Ben, a bus driver with the Choctaw Transit Authority, picked up a passenger, Monica.[1] Monica was eighteen years old at the time and a student at East Central Community College. Monica lived on Highway 35 outside of Carthage, Mississippi. Monica testified that she was the first passenger on the bus that morning. At one point during the ride, Ben pulled over at the intersection of Highways 35 and 25 in Carthage. Monica testified that Ben then came back to her seat and tried to kiss her. Monica resisted his advances by pushing, kicking, and yelling; but Ben overpowered her. Monica testified that Ben was able to pin her down, while he pulled her pants and underwear down. Monica stated that Ben then inserted his penis into her vagina. Monica stated that after the rape, Ben cleaned himself with paper towels, and then he threw these paper towels out of the bus.
Monica did not notify anyone of the rape until October[] 7, 2007, when she told her best friend, Maurice Hines. Monica testified that she waited until then to notify anyone because she was ashamed and embarrassed. Monica identified Ben in the courtroom as the person who had raped her.
*1241 Hines testified that he spoke with Monica the night of October 7th. Hines testified that he could tell that Monica was upset and urged her to confide in him. Hines testified that Monica then told him that she had been raped by Ben. Monica then informed her mother of the situation, and her mother called the Choctaw Police Department. Officer Timothy Thomas responded to Monica’s home, where he took Monica’s statement and received the clothes Monica had worn at the time of the rape. Officer Thomas then followed Monica to the location of the rape, where Officer Thomas was able to locate the paper towels used by Ben. Monica had informed Officer Thomas that the paper towels were “brown or pink-looking.” Officer Thomas then determined that the rape had occurred in Carthage, so the Carthage Police Department was notified and given the evidence collected thus far. On cross-examination, Officer Thomas testified that in his report, he noted that Monica told him that she had waited to report the crime because she felt ashamed, dirty, and partly responsible. Officer Van Perry of the Carthage Police Department testified that he took possession of the four paper towels and the victim’s clothing. Officer Perry then handed the evidence to Officer Kevin Cross. Officer Perry also told Monica that she needed to undergo a rape test. Sharon Hockett, a registered nurse with the Choctaw Health Department, was called in to perform an exam on Monica. Hockett testified that Monica appeared upset and frightened, but a rape kit was not performed because the rape had occurred over seventy-two hours prior to the exam.
Bill Jones, an analyst with the Mississippi State Crime Laboratory, testified that samples of a paper towel containing seminal fluid and blood samples from Ben and Monica were sent to a private forensic laboratory, Orchid Cellmark, in Texas for further DNA testing. Casey Dupont, the senior forensic scientist at Orchid, performed DNA testing on all three samples. Dupont testified that the stain on the paper towel contained a mixture consistent with the DNA from the blood samples from both Ben and Monica.
Ben v. State, 96 So.3d 9, 12-13 (Miss.Ct. App.2011).
¶ 3. Otis Mingo, a dispatcher/driver for Choctaw Transit, also testified about a sexually inappropriate remark that Ben purportedly had made about Monica two days before the alleged rape occurred.
¶ 4. Ben was convicted of forcible rape and sentenced to life imprisonment. He appealed to this Court, and we assigned his appeal to the Court of Appeals. The Court of Appeals affirmed his conviction and sentence. Id. at 16-17. In his petition for writ of certiorari, Ben argues (1) that his constitutional right to a speedy trial was violated; (2) that Otis Mingo’s testimony was inadmissible due to a discovery violation by the State; (3) that the admission of Maurice Hines’s hearsay testimony was not harmless error; (4) that the admission of Nurse Sharon Hockett’s statement concerning Monica’s veracity was improper; and (5) that the verdict was contrary to the weight and the sufficiency of the evidence. We address each issue below.
DISCUSSION
I. Ben’s constitutional right to a speedy trial was not violated.
¶ 5. After analyzing the four factors set forth in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court of Appeals held that Ben’s con *1242 stitutional right to a speedy trial had not been violated. Id. at 13-15. Ben argues that the Court of Appeals’ analysis was flawed. He asserts that much of the delay in bringing him to trial was attributable to the State’s “inexcusable delay” in submitting DNA evidence for testing. Further, he contends that the Court of Appeals incorrectly found that he was not prejudiced by the failing memories of some potential witnesses.
¶ 6. The Sixth Amendment to the United States Constitution affords an accused “the right to a speedy and public trial....” U.S. Const. amend. VI. That right is applicable to the states through the Due Process Clause of the Fourteenth Amendment. Klopfer v. N. Carolina, 386 U.S. 213, 222-23, 87 S.Ct. 988, 993-94, 18 L.Ed.2d 1 (1967). Article 3, Section 26 of the Mississippi Constitution of 1890 likewise guarantees criminal defendants the right to “a speedy and public trial....” Miss. Const. art. 3, § 26.
¶ 7. In Barker, the Supreme Court set forth four factors to consider whenever a defendant alleges that his constitutional right to a speedy trial has been violated: (1) the length of delay; (2) the reason for the delay; (3) whether the defendant asserted his right; and (4) prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. 2182. None of these four factors is “a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.” Barker, 407 U.S. at 533, 92 S.Ct. 2182. All, rather, are related and must be considered alongside other relevant circumstances. McBride, 61 So.3d at 142 (citing Barker, 407 U.S. at 533, 92 S.Ct. 2182). Thus, courts must engage in “a difficult and sensitive balancing process.” McBride, 61 So.3d at 142 (citing Barker, 407 U.S. at 533, 92 S.Ct. 2182).
¶ 8. Where, as here, a trial court issues findings of fact and gives reasons for its decisions with regard to the Barker factors, we will uphold its findings so long as they are based upon substantial, credible evidence. McBride, 61 So.3d at 142 (citing State v. Ferguson, 576 So.2d 1252, 1255 (Miss.1991)).
A. Length of the Delay
¶ 9. “The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other” Barker factors. Barker, 407 U.S. at 530, 92 S.Ct. 2182. In Mississippi, a delay of more than eight months is considered presumptively prejudicial. McBride, 61 So.3d at 142 (citing Stark v. State, 911 So.2d 447, 450 (Miss.2005)).
¶ 10. The Sixth Amendment speedy-trial right attaches at the time of formal indictment or information or arrest — whichever occurs first. McBride, 61 So.3d at 142 (citing United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971)). Ben was arrested on October 19, 2007, and remained incarcerated until November 5, 2007, when he posted bail. His trial began May 11, 2009. This amounted to a delay of more than eighteen months or about 570 days. Because the delay exceeds eight months, a full Barker analysis is warranted.
B. Reason for the Delay
 ¶ 11. “Once the delay is deemed presumptively prejudicial, ‘the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons.’ ” McBride, 61 So.3d at 142 (quoting Ferguson, 576 So.2d at 1254). Different reasons are assigned different weights. Barker, 407 U.S. at 531, 92 S.Ct. 2182. Deliberate attempts to delay the *1243 trial in order to hamper the defense are weighed heavily against the State. Id. On the other hand, “[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.” Id.
¶ 12. This Court is reluctant to weigh heavily against the State investigative delay caused by an instrumentality of the State, such as the state crime lab. State v. Woodall, 801 So.2d 678, 682-83 (Miss.2001) (citing State v. Magnusen, 646 So.2d 1275, 1281 (Miss.1994) (declining to hold the State responsible for a five-month delay caused by the state crime lab’s inaction); Gray v. State, 728 So.2d 36, 48 (Miss.1998) (finding that delay caused by FBI laboratory’s preparation of DNA evidence weighed very slightly, if at all, in favor of the defendant)); see also Jenkins v. State, 947 So.2d 270, 277 (Miss.2006) (stating that 520-day delay caused by state crime lab and private company’s DNA testing did not weigh heavily against the State) (citations omitted); Manix v. State, 895 So.2d 167, 175-76 (Miss.2005) (finding that an almost two-year delay due, in part, to a backlog facing the state crime lab weighed slightly against the State).
¶ 13. The trial court attributed the delay in this case to the evidence-gathering process and the timing and limited number of grand-jury sittings in Leake County. On October 8, 2007, the Choctaw Police Department took possession of four paper towels and some clothing that the victim had worn at the time of the alleged incident. That evidence was submitted to the Mississippi Crime Laboratory on October 15, 2007. The crime lab tested those items for the presence of seminal fluid. The initial results, completed on January 15, 2008, showed that seminal fluid was present on two of the paper towels. Three days later, Ben voluntarily submitted blood samples. Further DNA analysis was then conducted from February 2008 until July 16, 2008, the date on which the crime lab generated its report. The Leake County grand jury had met one month prior to the issuance of the crime lab’s report. Another grand jury was scheduled to meet the latter part of July 2008, but the State did not present Ben’s case to the grand jury until the grand jury’s next scheduled meeting in November 2008.
¶ 14. Ben argues that the delay in acquiring the DNA-testing results was not a product of the testing process but was caused by the State’s delay in submitting the necessary evidence to the crime lab. We do not find this to be supported by the record. The State submitted the paper towels and the victim’s clothing to the crime lab soon after it had acquired those items. And soon after the crime lab’s initial report showed the presence of seminal fluid on the paper towels, the State obtained blood samples from Ben and had further DNA analysis done. We do not find that the State waited an inexcusable length of time in submitting evidence for testing.
 15. The record further reflects that Ben requested a continuance. The trial court granted Ben’s request on January 27, 2009, and continued the matter until May 11, 2009. As the Court of Appeals noted, “well-taken” motions for continuance may justify a delay in criminal cases. Flora v. State, 925 So.2d 797, 815 (Miss.2006).
¶ 16. In sum, the delay from October 2007 to November 2008 should be weighed only slightly against the State, since that delay was unintentional and attributable to the state crime lab. And the delay from *1244 January 2009 to May 2009 was justified based on Ben’s request for a continuance. Accordingly, this factor weighs only marginally against the State.
C. Assertion of the Right to a Speedy Trial
¶ 17. In Barker, the Supreme Court rejected “the rule that a defendant who fails to demand a speedy trial forever waives his right.” Barker, 407 U.S. at 528, 92 S.Ct. 2182. Many courts until then had endorsed such a rule. Id. at 524, 92 S.Ct. 2182. The better rule, the Court said, was that a “defendant’s assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right.” Id. Later in its opinion, the Court discussed the significance and weight of this particular factor. Id. at 531-32, 92 S.Ct. 2182. It explained that “ [t]he more serious the deprivation, the more likely a defendant is to complain.” Id. at 531, 92 S.Ct. 2182. Consequently, “[t]he defendant’s assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.” Id. at 531-32, 92 S.Ct. 2182 (emphasis added); see also Doggett v. United States, 505 U.S. 647, 653, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 (1992) (finding that Barkers third factor would have weighed heavily against the defendant if he had known about the charges against him and yet had failed to assert his speedy-trial rights). The Court then added, “We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.” Id. at 532, 92 S.Ct. 2182.
¶ 18. Ordinarily, a defendant’s failure to assert his right to a speedy trial weighs heavily against him. Spencer v. State, 592 So.2d 1382, 1394 (Miss.1991) (Banks, J., concurring) (citing Adams v. State, 583 So.2d 165 (Miss.1991)). Indeed, this Court has “repeatedly held that a defendant’s failure to assert his right to a speedy trial must be weighed against him.” Young v. State, 891 So.2d 813, 818 (Miss.2005) (citing Watts v. State, 733 So.2d 214, 236 (Miss.1999)); State v. Woodall, 801 So.2d 678, 684 (Miss.2001); cf. Jaco v. State, 574 So.2d 625, 632-33 (Miss.1990) (stating simply that neither defendant had gained “any points” because of his failure to demand a speedy trial, though the Court seemingly weighed their failure to do so against them in its reconciliation of the various factors); Flores v. State, 574 So.2d 1314, 1323 (Miss.1990) (stating that “the primary burden is on the courts and the prosecutors to assure that cases are brought to trial,” that the defendant’s “failure to consistently badger the prosecution to proceed with his trial” did not eliminate his speedy-trial claim, and consequently, that defendant’s “failure to assert his right to speedy trial should be weighed against him only lightly, if at all,” before finally concluding that defendant’s failure to aggressively assert his right to a speedy trial did not favor him). And, generally, we reject the assertion that a defendant’s failure to demand a speedy trial should be balanced equally against the State and the defendant. Woodall, 801 So.2d at 685. There are exceptions, however. In some circumstances, we have held that a defendant’s failure to assert his speedy-trial right weighed against him only lightly, if it all. Adams, 583 So.2d at 170 (Miss.1991) (citing Trotter v. State, 554 So.2d 313, 317 (Miss.1989), superseded by statute on other grounds) (finding that defendant’s failure to assert his right to a speedy sentencing weighed against him “only lightly, if at all,” because defendant had good reason to believe that he would not receive a penitentiary sentence so long as he complied with certain conditions); see also Wiley v. State, 582 So.2d 1008, 1012 (Miss.1991) *1245 (finding that defendant’s failure to assert his right to a speedy trial until one day before trial was neutral because he had been practically without representation due to changes in his counsel). But, absent such “special circumstances,” this factor is given “ ‘strong evidentiary weight.’ ” Adams, 583 So.2d at 170 (citing Barker, 407 U.S. at 531, 92 S.Ct. 2182).
¶ 19. A large portion of the delay in this case occurred post-arrest, preindictment. Nevertheless, this Court has determined that defendants have the responsibility to demand a speedy trial between their arrest and their indictment. Young v. State, 891 So.2d 813, 818 (Miss.2005) (citing State v. Woodall, 801 So.2d 678, 684 (Miss.2001)). Other courts have said the same. United States v. Edwards, 577 F.2d 883, 889 (5th Cir.1978) (finding that defendant’s failure to demand a trial during the thirteen months between his arrest and indictment weighed in favor of the government) (citing United States v. Garza, 547 F.2d 1234 (5th Cir.1977)); United States v. Macino, 486 F.2d 750, 753-54 (7th Cir.1973) (stating that “the weight to be given the absence of a demand in cases where the delay is between arrest and indictment is substantially less than in cases of post[-]indictment delay” and giving the absence of a post-arrest, preindictment demand in that case “minimum weight”). Further, we have said that a defendant’s failure to do so in such instances is “critical” to an analysis of the speedy-trial issue. Young, 891 So.2d at 818 (citing Woodall, 801 So.2d at 684).
¶ 20. Ben filed a Motion to Assert Defendant’s Right to a Speedy Trial and Dismissal of the Indictment for Violation of his Right to a Speedy Trial on January 5, 2009 — about fifteen months after his arrest and two months after his indictment. In his motion, Ben both requested a speedy trial and sought dismissal of his indictment based on a speedy-trial violation.
¶ 21. Though Ben’s January 5, 2009, motion included a request for a speedy trial, the context and timing of the motion shows that he was actually seeking dismissal, not a trial. Adams v. State, 583 So.2d 165, 169 (Miss.1991). At the January 7, 2009, hearing on his speedy-trial motion, Ben’s counsel noted that a trial date already had been scheduled for the month of January 2009. The record elsewhere confirms that a January 20, 2009, trial date had been set. Since Ben filed his January 5, 2009, speedy-trial motion with knowledge that trial was scheduled just two weeks later, Ben could only have been seeking dismissal — it was clear that he was getting a trial that same month. Id. (finding that defendant had sought dismissal, not trial, where it was clear that he would be getting a trial during the same term in which he had filed his speedy-trial motion). He did not have a right to an instant trial. Id. Ben’s motion, therefore, is best characterized as “a demand for dismissal coupled with a demand for an instant trial,” which he filed after the bulk of the delay had elapsed. Perry v. State, 637 So.2d 871, 875 (Miss.1994) (citing Adams, 583 So.2d at 169-70). Accordingly, this factor weighs against Ben. Adams, 583 So.2d at 169-70; Perry, 637 So.2d at 875; see also Spencer v. State, 592 So.2d 1382, 1388 (Miss.1991) (finding that defendant’s failure to assert his right to a speedy trial until the eve of trial, 535 days after his arrest, caused the third Barker factor to weigh against him).
D. Prejudice to Ben
¶ 22. Prejudice must be assessed in light of the interests that are designed to be protected under the right to a speedy trial. McBride, 61 So.3d at 145 (citing Barker, 407 U.S. at 532, 92 S.Ct. 2182). *1246 Barker identifies three such interests: “(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.” Barker, 407 U.S. at 582, 92 S.Ct. 2182. The last is the most serious. Id. Possible impairment to one’s defense includes the unavailability of witnesses or witnesses’ loss of memory. Id.
¶ 23. Ben argues that his defense was prejudiced because of the fading memories of some potential witnesses. After his indictment, Ben’s counsel interviewed several of the bus riders who had gotten on the bus shortly after the alleged rape had occurred. “Several of them,” according to Ben, did not really remember anything due to the.passage of time. At trial, Monica testified that she had put her head down in her hands and sobbed silently as additional passengers boarded the bus. Ben argues that these witnesses could have testified about Monica’s demeanor that morning and whether it was consistent with what she had described at trial.
¶ 24. We are not persuaded that the fading memories of these potential, unnamed witnesses impaired Ben’s defense. There is no dispute that sexual intercourse occurred. And Ben knew as early as October 2007 that he was being charged with rape. Though he cannot necessarily be faulted for waiting until after his indictment to interview these potential witnesses, he had the opportunity and incentive to interview them before then. Regardless, mere “possibility of prejudice” is not sufficient to support a speedy-trial violation. United States v. Loud Hawk, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986); see also United States v. Koskotas, 888 F.2d 254, 257 (2d Cir.1989) (citing Loud Hawk for the proposition that “[a] mere ‘possibility of prejudice is not sufficient’ to tilt the fourth [Barker ] factor in the defendant’s favor”). These passengers may or may not have testified favorably for Ben; their testimony, had they been able to recall the events of that day, remains speculative. Cf. Woodall, 801 So.2d at 686-87 (finding mere assertions and speculation that deceased witness would have offered exculpatory testimony insufficient to show prejudice). More importantly, Ben does not assert that all of the passengers had lapsed memories. Some of them, apparently, had been able to recall something about their bus ride that day.
¶ 25. Ben further argues that he was prejudiced by restraints to his liberty. First, Ben was suspended from, and eventually lost, his job as a result of his arrest. And he was unable to find employment elsewhere due to the allegations against him. As a result, his wife provided the sole source of income during those months. Second, and relatedly, Ben asserts that he suffered a great deal of anxiety and was viewed with suspicion as he awaited indictment and then trial.
¶ 26. Barker recognized that, even when an accused is not incarcerated prior to trial, “he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.” Barker, 407 U.S. at 533, 92 S.Ct. 2182 (citations omitted). Whether an accused is free or not, inordinate delay ‘“may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.’ ” Moore v. Arizona, 414 U.S. 25, 27, 94 S.Ct. 188,190, 38 L.Ed.2d 183 (1973) (quoting Marion, 404 U.S. at 320, 92 S.Ct. 455). These factors, of course, are present in every case to some extent and are more serious for some than others. Moore, 414 U.S. at 27, 94 S.Ct. 188 (citing Barker, 407 *1247 U.S. at 537, 92 S.Ct. 2182 (White, J., concurring)).
¶ 27. Due to the restraints imposed on his liberty, we find that Ben is entitled to a slight degree of prejudice under this fourth Barker factor.
E. Balancing Test
¶ 28. Our balancing of the factors here is guided by Barker itself. There, the length of delay between arrest and trial was extraordinary — five years. Barker, 407 U.S. at 538, 92 S.Ct. 2182. Only seven months of that period were “attributed to a strong excuse.” Id. at 534, 92 S.Ct. 2182. Yet, the Court found that two counterbalancing factors outweighed those deficiencies. Id. First, the prejudice had been minimal. Id. Though Barker had lived “under a cloud of suspicion and anxiety” for four years and had spent ten months in jail before trial, none of his witnesses had died or had become unavailable. Id. And there were only two incidences at trial in which witnesses exhibited very slight, insignificant lapses of memory. Id. Second, the Court stated that “[m]ore important than the absence of serious prejudice, [was] the fact that Barker did not want a speedy trial.” Id. This was evidenced by his failure to assert his right to a speedy trial and his concession at oral argument that he had acquiesced in the delay in hopes that he would never be tried. Id. at 534-35. Thus, the Court held that Barker had not been deprived of his due-process right to a speedy trial. Id. at 536. “[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.” Id. The significance of Barker’s failure to assert his speedy-trial right was highlighted even more in Justice White’s concurring opinion: He “attributed the Court’s affirmance of Barker’s conviction chiefly to [Barker’s] failure to assert his right to a speedy trial, commenting that ‘it is apparent that had Barker not so clearly acquiesced in the major delays involved in this case, the result would have been otherwise.’ ” Woo-dall, 801 So.2d at 684 (citing Barker, 407 U.S. at 537, 92 S.Ct. 2182).
¶ 29. After considering and weighing all of the Barker factors, we find that the trial court’s speedy-trial ruling was supported by substantial, credible evidence. True, two of the Barker factors — the reason for the delay and prejudice to Ben — weigh against the State, but only slightly. The bulk of the delay in this case was due to the state crime lab’s forensic and DNA testing. This evidence was critical to the case. Further, the prejudice here, as in Barker, was minimal. And despite the anxiety and hardship that Ben may have endured, the fact remains that he waited until two weeks before his initial trial date to assert his right to a speedy trial. The third Barker factor, therefore, weighs against him.
¶ 30. Though close, the minimal prejudice here and the fact that Ben did not want a speedy trial leads us to find that Ben’s constitutional right to a speedy trial was not violated. Compare with Barker, 407 U.S. at 534-36, 92 S.Ct. 2182.
II. Ben did not waive his challenge to the discovery violation involving Otis Mingo’s testimony; nevertheless, the trial court’s failure to follow Rule 9.04 of the Uniform Circuit and County Court Rules does not require reversal.
¶ 31. Otis Mingo testified about a statement Ben had made two days before the alleged rape. Mingo said that he and Ben were at the Transit Authority; Monica was there, too. When Ben noticed Monica ly *1248 ing on a picnic table with her legs propped up, he purportedly told Mingo: “That stuff looks real good.”
¶ 32. On appeal, Ben argued that this statement had not been disclosed during discovery. Ben, 96 So.3d at 14-15. The Court of Appeals stated that the trial court had noted that Ben had been notified of the State’s intent to use Mingo as a witness approximately five months before trial. Id. Further, it held that the issue was procedurally barred because Ben had failed to move for a continuance at trial. Id. at 15-16 (citing Sims v. State, 928 So.2d 984, 988 (Miss.Ct.App.2006)).
¶ 33. On certiorari, Ben reiterates that the State committed a discovery violation by failing to disclose the substance of Min-go’s testimony. He argues that the Court of Appeals erred in finding that he had waived the issue by failing to request a continuance or a mistrial. He points out that the trial court, in ruling on the admissibility of Mingo’s testimony, refused to allow him time to interview Mingo; consequently, he asserts that he should not be faulted for failing to request a continuance.
¶ 34. At trial, Ben objected just as Min-go was about to utter the comment Ben had made about Monica. Ben asserted that, despite having filed a discovery motion requesting the substance of each witness’s testimony, he had never been made aware of what Mingo intended to say. The State countered that Ben had been on notice that Mingo was a potential witness because it had issued a subpoena for Min-go on January 15, 2009. Ben said that he did not recall receiving such notice; however, he did not dispute the State’s representation. He claimed that he first learned of Mingo in an updated witness list that he had received a week or a week and a half before trial. Regardless, the real issue, he insisted, was not lack of notice of Mingo as a witness, but lack of notice as to the substance of Mingo’s anticipated testimony. The trial judge found that Ben had known about Mingo since January 2009 and that Ben should have gone and interviewed him. The trial judge added, “I’m not offering to give you time to go and recess and interview the witness. The statement’s already been made. It’s before the jury.”[2] The trial judge thus overruled Ben’s objection and allowed Mingo to continue his testimony.
¶ 35. Rule 9.04(A)(1) of the Uniform Circuit and County Court Rules requires the State, upon written request, to disclose the identity of its witnesses in chief and the substance of their written or oral statements. URCCC 9.04(A)(1). The rule states that:
[T]he prosecution must disclose to each defendant or to defendant’s attorney, and permit the defendant or defendant’s attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness ....
URCCC 9.04(A)(1) (emphasis added). Rule 9.04(I)(l)-(3) then outlines the procedure that trial courts must follow when *1249 faced with an undisclosed discovery violation during trial:
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
URCCC 9.04(I)(l)-(3).
¶ 36. Rule 9.04(I)(l)-(3) is a codification of the guidelines first announced by this Court in Box v. State, 437 So.2d 19, 22-26 (Miss.1983) (Robertson, J., specially concurring); McGowen v. State, 859 So.2d 320, 337 n. 5 (Miss.2003). These guidelines were intended to prevent “ambush” or unfair surprise at trial by either party. Harrison v. State, 635 So.2d 894, 898 (Miss.1994) (quoting Holland v. State, 587 So.2d 848, 866-67 (Miss.1991)). We have said that failure to follow Rule 9.04(1) necessitates reversal. See McGowen, 859 So.2d at 337 (citing Harrison, 635 So.2d at 898); see also McCullough v. State, 750 So .2d 1212,1217 (Miss.1999) (quoting Snelson v. State, 704 So.2d 452, 458 (Miss.1997)) (citations omitted) (stating that “[fjailure to follow the Box guidelines is prejudicial error, requiring reversal and remand”). More recently, however, we stated “[a] violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice.” Payton v. State, 897 So.2d 921, 942 (Miss.2003) (citations omitted); see also Ross v. State, 954 So.2d 968, 1000-01 (Miss.2007) (stating that reversal is not “inexorably require[d]” and that the key inquiry is whether the trial court’s failure to adhere to Rule 9.04(1) prejudiced the defendant).
¶ 37. In his motion for discovery filed November 12, 2008, Ben requested the names of all witnesses to be offered by the prosecution at trial and “the substance of any oral statement made by any such witness.” When the State attempted to introduce Mingo’s testimony at trial, Ben objected on the basis that the State had failed to disclose the substance of his testimony. Yet, the procedure set forth in Rule 9.04(I)(l)-(3) was not followed. The trial judge was upfront that Rule 9.04(I)(1) was not an option: He stated that he was not going to allow Ben time to interview Mingo. It is only after such an interview or examination that the burden shifts to the defense to request a continuance. McGowen, 859 So.2d at 338. Since such an interview was prohibited and did not occur here, Ben never had the burden to request a continuance; thus, he did not waive the discovery-violation issue.
¶ 38. Though the trial court erred by failing to follow Rule 9.04(I)(1)-(3), we find that the error was harmless. Based on the entirety of record, including the physical evidence, Monica’s testimony, and the fact that Mingo was identified as a *1250 witness months before trial, we cannot say that the trial court’s failure to grant a continuance or its admission of Ben’s remark to Mingo caused a miscarriage of justice. See Payton, 897 So.2d at 942 (finding that the trial court’s failure to grant a continuance was harmless error, in part, because the evidence adequately supported the verdict and because the jury would have convicted the defendant even without the evidence in question). Nor was Ben’s case unfairly prejudiced. Compare Ross, 954 So.2d at 997-1001 (finding that failure to follow Rule 9.04(1) prejudiced the defendant because the excluded evidence pertained to the credibility of a witness whose testimony was the only direct evidence linking the defendant to the crime). Ben’s alleged remark to Mingo showed that Ben was sexually attracted to Monica but that is all: It did not support that either forcible or consensual sexual intercourse occurred two days later. True, the remark had bothered Mingo. He chastised Ben: “I just told [Ben] ... whatever you’re thinking, stop it. She’s a young lady.” Mingo said that “comments like that shouldn’t be made from a professional level,” and he reported Ben to their supervisor as a result. But regardless of the inappropriateness of the remark in a professional environment, it did not show that force was or was not used, or that action was contemplated or planned. The question of consent or nonconsent — the central issue in this case — remained unanswered even after the admission of this alleged remark.
¶ 39. For these reasons, we find that the trial court’s failure to follow Rule 9.04(I)(l)-(3) was harmless error.
III. The admission of Maurice Hines’s testimony was not error.
¶ 40. Ben argues that the Court of Appeals erred in finding that the admission of Hines’s hearsay testimony was harmless error.
¶ 41. At trial, Hines testified that Monica had told him that she had been raped by Ben. Ben objected based on hearsay, but the trial court overruled the objection and admitted Hines’s testimony under Rule 803(3) of the Mississippi Rules of Evidence.[3] Hines eventually described what Monica had told him about how she had been raped. “[Monica] told me that she was sitting at the back of the bus and as she was sitting there, that [Ben] got up and he came to the back of the bus and he forced his self [sic] on her ...,” Hines said. He added that Monica had told him that “she tried to push [Ben] away[,][b]ut the more she pushed him away, the more he kept forcing his self [sic] on her.” Hines also affirmed that he had known Monica for years and that she had never lied to him before.
¶ 42. The Court of Appeals held that Hines’s testimony was clearly hearsay because it was offered to prove that Ben had raped Monica. Ben, 96 So.3d at 14-15. Yet, it found that the admission of his testimony was harmless error “since the properly admitted evidence ... [was] more than sufficient to support the jury’s verdict.” Id.
¶ 43. We agree with the Court of Appeals that Rule 803(3) does not apply here; nevertheless, we disagree that Moni *1251 ca’s statements to Hines constituted hearsay. Monica’s prior statements served a purpose other than to prove the truth of the matter asserted, i.e., that Ben had raped Monica: they rehabilitated Monica as a witness and were admissible for that purpose.
¶44. On cross-examination, Ben tried to show that Monica had fabricated the rape allegation. He attempted to cast doubt on Monica’s direct testimony by questioning her about the specific details of the incident. Essentially, he tried to make her description of the rape sound physically implausible. He emphasized discrepancies and omissions about certain details. For example, he made much of the fact that she had told one officer that Ben had pulled her panties down but told another officer that he had pulled them completely off. And he questioned why she had not told the police that Ben had forced her legs apart. Further, he challenged Monica as to whether she had ever made a statement to police that the reason she had waited so long to tell anyone about the rape was that she thought it might have been her fault. Monica denied that she had made such a statement; she reiterated that she had not reported the incident because she had “felt dirty and embarrassed.” Ben pressed Monica about the four-day time period between the alleged rape and when she first reported it to anyone: Why had she not told any of the other bus passengers that morning? Why had she not told anyone at school? Why had she continued to ride the transit bus when Ben might have been the driver again? And why had she not washed the clothes that she had worn that morning? In sum, Ben attempted to show that Monica had welcomed his advances, had fabricated the rape allegations, and had contrived all the details.
¶ 45. Rule 801(d)(1)(B) provides that a statement is not hearsay if: (1) the declar-ant testifies at trial; (2) he or she is subject to cross-examination about the statement; (3) the statement is consistent with the declarant’s trial testimony; and (4) the statement “is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.” Miss. R. Evid. 801(d)(1)(B). Monica’s prior statements to Hines — recounting that Ben had approached her uninvit-edly and had forced himself on her as she tried to fight him away — were consistent with her trial testimony and refuted Ben’s assertions that she had instigated (or believed that she had instigated) their encounter and had fabricated her story for trial.
¶ 46. An additional requirement for admissibility under Rule 801(d)(1)(B) is that “the consistent statements must have been made prior to the arising of the alleged motive to fabricate.” Owens v. State, 666 So.2d 814, 817 (Miss.1995) (quoting Tome v. United States, 513 U.S. 150, 160, 115 S.Ct. 696, 702, 130 L.Ed.2d 574 (1995)). Here, however, Ben never developed or explained what had motivated Monica to fabricate such charges. In such instances, where “the defense raises the claim of fabrication without alleging any particular impermissible motive or source of influence,” we have affirmed the admissibility of prior statements for the purpose of rehabilitating the declarant as a witness. Hobson v. State, 730 So.2d 20, 24 (Miss.1998); see also Hosford v. State, 560 So.2d 163,168 (Miss.1990).
¶ 47. Notably, numerous federal courts have held that prior consistent statements offered for the limited purpose of rehabilitation are not governed by Rule 801(d)(1)(B) at all. Frank W. Bullock, Jr. & Steven Gardner, Prior Consistent Statements and the Premotive Rule, 24 F.S.U. L.Rev. 509, 521 & n. 86 (1997). Their *1252 admissibility, rather, is based on a more relaxed standard of “ ‘whether the particular consistent statement sought to be used has some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony.’ ” United States v. Ellis, 121 F.3d 908, 920 (4th Cir.1997) (quoting United States v. Castillo, 14 F.3d 802, 806 (2d Cir.1994)). For example, a prior consistent statement may be admissible for the purpose of rehabilitation if it tends to cast doubt on whether a prior inconsistent statement was made or whether an impeaching statement is really inconsistent with the declarant’s trial testimony. Castillo, 14 F.3d at 806 (quoting United States v. Pierre, 781 F.2d 329, 333 (2d Cir.1986)). Use of a prior consistent statement is also permissible if it amplifies or clarifies an allegedly inconsistent statement or if it furthers the doctrine of completeness. Castillo, 14 F.3d at 806 (quoting Pierre, 781 F.2d at 333). Monica’s statements to Hines had such rebutting force: Her statements to Hines, made just hours before she spoke to police, tended to cast doubt on whether Monica had told police that she had thought the rape was her fault. At the very least, her statements furthered the doctrine of completeness and clarified that she had not meant that she had invited or welcomed Ben’s advances.
¶ 48. Though Monica’s statements to Hines were not admissible to prove that Ben had raped Monica, the statements were admissible to rehabilitate her credibility as a witness. Accordingly, we find that the admission of Hines’s testimony was not error.
IV. Review of the admissibility of Nurse Sharon Hockett’s comment on Monica’s veracity is procedurally barred.
¶ 49. Nurse Hockett testified that she had performed the sexual-assault examination on Monica. She said that Monica was frightened and upset and that Monica had told her that she had been raped. On redirect, the State asked Hock-ett if there was anything that indicated that Monica was not telling the truth. Hockett responded, “There was nothing to indicate that she was not telling the truth.” Ben argues that Hockett’s comment on Monica’s veracity was improper. Further, he contends that the jury might have given considerable weight to this improper statement due to Hockett’s status as a “sexual assault nurse examiner.”
¶ 50. Like the Court of Appeals, we find that this issue is procedurally barred because of Ben’s failure to make a contemporaneous objection at trial. Davis v. State, 43 So.3d 1116, 1126 (Miss.2010) (quoting Dixon v. State, 953 So.2d 1108, 1116 (Miss.2007)). Further, we do not find that a manifest miscarriage of justice resulted so as to warrant plain-error review. Davis, 43 So.3d at 1126 (quoting Dixon, 953 So.2d at 1116).
V. The verdict was not contrary to the weight and sufficiency of the evidence.
¶ 51. Ben challenges both the sufficiency and the weight of the evidence.
¶ 52. The critical inquiry in reviewing the sufficiency of the evidence is “whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ” Bush v. State, 895 So.2d 836, 843 (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). We will affirm if “ ‘after viewing *1253 the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Bush, 895 So.2d at 843 (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). But reversal is warranted if the facts and inferences “ ‘point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.’ ” Bush, 895 So.2d at 843 (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
¶ 53. In reviewing a challenge to the weight of the evidence, we consider the evidence in the light most favorable to the verdict. Bush, 895 So.2d at 844 (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)). We will disturb the verdict only “when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (citing Herring, 691 So.2d at 957).
¶ 54. Ben argues that the only evidence to support the use of force was Monica’s uncorroborated, contradictory testimony. He mentions several ways that Monica’s story was conflicting. First, he asserts that her behavior was not consistent with that of a rape victim: She did not report the alleged incident for several days, and she did not wash the clothes that she had been wearing that day. Second, even though she described a forceful attack, there was no evidence of a scratch or a bruise. None of her clothing was torn. Finally, he points to some inconsistencies in her trial testimony. She made contradictory statements as to whether, or what, she had spoken to Ben as he pulled the bus to the side of the road. And her recollection of how the alleged rape had occurred also was inconsistent in some respects. Monica alleged that Ben had removed her pants and undergarments and that she had tried to push him away or fight him off at the same time. Ben questions how both could have occurred if, as she further alleged, he had had her arms pinned behind her or had held onto them during the attack.
¶ 55. We have held that “[a]n individual may be found guilty of rape on the uncorroborated testimony of the prosecuting witness, where the testimony is not discredited or contradicted by other credible evidence.” Parramore v. State, 5 So.3d 1074, 1077 (Miss.2009) (citations omitted). Here, Monica’s testimony was not uncorroborated. Though use of force was not corroborated, other facts surrounding the incident were. Otis v. State, 418 So.2d 65, 67 (Miss.1982) (finding that the verdict was not against the overwhelming weight of the evidence where there were other facts surrounding the rape that had corroboration, even though the victim’s testimony was not corroborated as to the actual rape itself).[4] The paper-towel *1254 evidence corroborated Monica’s story; she was able to describe and lead police to the exact location of where the alleged incident had occurred. But even if Monica’s testimony had been uncorroborated, her testimony was not “discredited or contradicted by credible evidence.” Monica’s post-incident behavior was a factor for the jury to consider, but her actions were not highly unreasonable or improbable. See Johnson, 58 So.2d at 8. She said that she did not immediately tell anybody about the incident because she was ashamed, embarrassed, and shocked. As for the lack of any bruises or scratches, signs of external injury are not absolutely determinative of forcible rape. Davis v. State, 406 So.2d 795, 801 (Miss.1981); Christian v. State, 456 So.2d 729, 734 (Miss.1984). The jury heard from multiple witnesses who affirmed that they had not noticed any physical injuries to Monica. Finally, any inconsistencies in Monica’s trial testimony were issues for the jury to resolve. Goss v. State, 413 So.2d 1033, 1035 (Miss.1982).
¶ 56. We find that there was sufficient evidence for a rational trier of fact to find Ben guilty of forcible rape and that allowing the guilty verdict to stand would not sanction an unconscionable injustice.
CONCLUSION
¶ 57. We find that Ben’s constitutional right to a speedy trial was not violated; that the trial court’s failure to follow Rule 9.04(I)(l)-(3) with regard to the admission of Otis Mingo’s testimony was harmless error; that the admission of Maurice Hines’s testimony was not error; that the admissibility of Nurse Hockett’s statement concerning Monica’s veracity is procedurally barred; and that the verdict was not contrary to the weight and the sufficiency of the evidence. Therefore, we affirm the decision of the Court of Appeals and the judgment in the Circuit Court of Leake County.
¶ 58. THE JUDGMENTS OF THE COURT OF APPEALS AND THE CIRCUIT COURT OF LEAKE COUNTY ARE AFFIRMED. CONVICTION OF RAPE AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, CHANDLER AND KING, JJ.

. The victim’s name has been changed to protect her identity.

. Mingo, in fact, had not yet stated what Ben had said about Monica. Ben objected to Min-go’s testimony just before Mingo communicated Ben’s remark.

. Rule 803(3) of the Mississippi Rules of Evidence exempts as hearsay:
A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
Miss. R. Evid. 803(3).

. Ben cites Johnson v. State, 213 Miss. 808, 58 So.2d 6 (1952), and Yancey v. State, 202 Miss. 662, 32 So.2d 151 (1947), as support that there must be corroboration of the act itself and the surrounding details in order to convict someone of forcible rape. Neither case supports this proposition, however. In Johnson, the Court reversed and remanded a rape conviction because the victim's account, though corroborated to an extent, had been unreasonable, improbable, and contradicted by credible witnesses. Johnson, 58 So.2d at 8-9. The Court in that case even stated that "a conviction of rape may rest upon the uncorroborated testimony of the person alleged to have been raped,” though it added that such testimony should be "scrutinized and weighed with care and caution.” Id. at 8. In Yancey, the Court reversed a conviction involving a violation of the "so-called age of consent statute.” Yancey, 32 So.2d at 152. In that case, the physical evidence was consis *1254 tent with innocence and the sole witness had not been able to identify whom he had seen at the scene of the alleged crime. Id. The Court did state that "corroboration must be, not merely of incidental details, but of the commission of the prohibited act.” Id. Yet, in the next sentence, it noted that "circumstances and admissions may be sufficient to this end.” Id. (citations omitted). The crux of that case was that there must be some corroboration of the alleged offense; mere opportunity or possibility is not enough. Id. (citations omitted).