IRVING, P.J.,
for the Court:
¶ 1. On February 8, 2012, a jury convicted Darius Cornelius Ford of aggravated assault and unlawful possession of a firearm by a convicted felon. The Scott County Circuit Court sentenced Ford, as a habitual offender, to twenty years for the aggravated-assault conviction and to ten years for the possession-of-a-firearm conviction, with the sentence in Count II to run consecutively to the sentence in Count I, all in the custody of the Mississippi Department of Corrections, without eligibility for parole or probation.
¶ 2. Feeling aggrieved, Ford appeals and presents several issues for review. For the sake of discussion and clarity, Ford’s issues have been restated and reordered below:
I. Whether the indictment properly charged Ford as a habitual offender.
II. Whether Ford was denied his right to a speedy trial.
III. Whether the State was required to produce the witness that certified the documents used to demonstrate Ford’s prior convictions.
IV. Whether the circuit court erred in its reading of the Sharplin[1] instruction.
V. Whether the circuit court properly denied Ford’s motions for a directed verdict and a new trial.
VI. Whether the circuit court committed cumulative error mandating reversal of Ford’s conviction and sentence.
Finding no reversible error, we affirm.
FACTS
¶ 3. On January 11, 2010, Sanford Lackey, a real estate appraiser, was in rural Scott County, Mississippi, photographing several parcels of land along Highway 21. After taking photos of a vacant property, Lackey realized that he had photographed the wrong property. Lackey testified that he drove along the road looking for a place to turn around. He decided to turn around at an old convenience store on Highway 21. As he was turning around, he heard three gunshots. When he looked in the direction where he thought the shots were coming from, he saw a man exit a nearby mobile home and walk toward a gold sport-utility vehicle (SUV). Lackey noted that the man looked in his direction as he descended the steps of the mobile home. The man was wearing a blue sweatshirt and a rolled-up toboggan. Lackey continued along the road, searching for the correct property to photograph.
¶ 4. Lackey testified that after taking the correct photos, he pulled to the side of the road to input another address into his GPS. After setting the GPS, Lackey pulled back onto the road. At that time, he noticed the gold SUV from the mobile home approach his vehicle from behind at a high rate of speed. Lackey sped up. When the vehicle was approximately a car length away, the driver leaned out of the driver’s side window, aimed a handgun, and shot through the rear windshield of Lackey’s vehicle. Then, the gold SUV turned around and sped away from Lackey. He stated that he immediately called the Scott County Sheriffs Department and subsequently went to the sheriffs office. While at the sheriffs office, Lackey saw Ford as the law enforcement officers brought him into the station. Lackey later told the officers that Ford was the individual that shot at his vehicle.
¶ 5. Kevin Polk, an investigator with the Scott County Sheriffs Department, testified that he and several other officers re *734 sponded to the call from dispatch regarding Lackey’s incident. He and the other officers went to the vicinity of where the incident had occurred. At the first mobile home that the officers approached, they spoke with Jessica Adams, Ford’s girlfriend. Adams told Investigator Polk that Ford had gone to pick up his children from school. Upon hearing this, Investigator Polk and an additional Scott County deputy left the mobile home to intercept Ford on his way back from the school. When Investigator Polk saw Ford’s vehicle, he stopped Ford and told him that he needed him to come into the station for questioning. Investigator Polk also had Ford’s vehicle towed to the sheriffs department.
¶ 6. Deputy Marcus Lingle, with the Scott County Sheriffs Department, testified that he participated in the search of Ford’s mobile home once Adams gave the officers written consent to search. During the search, Deputy Lingle found a .40-caliber pistol on the bed and a box of ammunition. The officers also recovered “male clothing [that was] hanging [in] the closet.” Deputy Lingle testified to finding “either a dark gray or blue sweatshirt” that “match[ed] a description of the upper garment worn by ... the suspect ... that day.” Deputy Lingle stated that “[f]rom [the] time of [the] incident to the time [they] arrived at the property was an estimation of at least thirty minutes.”
¶ 7. Adams testified that although the mobile home was in Ford’s mother’s name, Ford did not live there. She admitted that Ford was at the home on the day of the incident. According to Adams, she and Ford slept from approximately 9:00 a.m. until 2:40 p.m. on the day of the incident. Adams noted that the male clothing hanging in the closet did not belong to Ford. Also, Adams testified that the gun that Deputy Lingle found on the bed belonged to her, and that Ford did not know that she owned the gun.
¶ 8. Ford testified that he was just one of several men that Adams was seeing at that time. He insisted that he did not live with Adams in the mobile home; that he did not own a firearm because he knew that, as a convicted felon, he could not; and that he did not own a dark blue pullover or sweatshirt. Ford admitted that he was a convicted felon. He also stated that he did not know Lackey and had never seen him prior to the morning of trial.
¶ 9. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

I. Indictment

¶ 10. “Whether an indictment is defective is an issue of law, which this Court reviews de novo.” Johnson v. State, 50 So.3d 335, 338 (¶ 8) (Miss.Ct.App.2010). Rule 11.03 of the Uniform Rules of Circuit and County Court applies in cases involving enhanced punishment for habitual offenders. Rule 11.03(1) states, in pertinent part: “The indictment must allege with particularity the nature or description of the offense[s] constituting the previous convictions, the state or federal jurisdiction of any previous conviction, and the date of judgment.”
¶ 11. The habitual-offender portion of Ford’s indictment reads as follows:
And he, the said Darius Cornelius Ford, then and there having been convicted twice previously of felony crimes upon charges separately brought and arising out of separate incidents at different times and having been sentenced to and served separate terms of one year or more for each of said felony convictions *735 in the Mississippi Department of Corrections to wit:
(1) he, the said Darius Cornelius Ford, was convicted on the 16th day of February, 1995, in Cause No. 4582 in the Circuit Court of Scott County, Mississippi, of the felony crime of Sale of Cocaine, and was sentenced to serve a term of six (6) years in the Mississippi Department of Corrections; and
(2) he, the said Darius Cornelius Ford, was convicted on the 21st day of May, 2007, in Cause No. 06-CR-074-SC-G in the Circuit Court of Scott County, Mississippi, of the felony crime of Count I-Possession of Cocaine and Count II-Possession of Less than 30 Grams of Marijuana, and was sentenced in Count I to serve a term of five (5) years in the Mississippi Department of Corrections, and was sentenced in Count II to pay a fine of $250;
he, the said Cornelius Darius Ford, therefore being a habitual criminal pursuant to [Mississippi Code Annotated] [sjection 99-19-81 [ (Supp.2013) ].
Ford contends that his indictment did not properly charge him as a habitual offender because it did not contain the judgment dates of his previous convictions. Ford’s contention is without merit. The record reveals that Ford entered guilty pleas in each of the cases used to charge him as a habitual offender. Therefore, the judgment date and the conviction date for the sale-of-cocaine offense was February 16, 1995. Likewise, the judgment date and the conviction date for the possession-of-cocaine offense and the possession-of-marijuana offense was May 21, 2007.
¶ 12. This Court has previously held that an indictment that contains “sufficient information to inform [the defendant] of the specific prior convictions upon which the State reliefs] for enhanced punishment” complies with due process and is not fatally defective. See Thomas v. State, 99 So.3d 1169, 1173 (¶ 14) (Miss.Ct.App.2012). Here, the indictment listed the previous convictions; the court that adjudicated each conviction; the date of each conviction, which is the date that Ford pleaded guilty to those crimes; the imposed sentences for each conviction; and the cause numbers for each conviction. Therefore, even though the indictment does not refer to the “date of judgment” for either conviction, the habitual-offender portion of the indictment was sufficient to put Ford on notice of the prior convictions used to charge him as a habitual offender. Accordingly, this issue is without merit.

II. Speedy Trial

¶ 13. Ford argues that the State violated his constitutional right to a speedy trial because approximately two years passed between the date of his arrest and the first day of his trial. “[T]he United States Supreme Court has stated that a formal indictment or information or an arrest-7-whieh ever occurs first—triggers the constitutional right to a speedy trial.” Havard v. State, 94 So.3d 229, 237 (¶ 21) (Miss.2012) (citing United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). “In Barker [v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ], the Supreme Court set forth four factors to consider whenever a defendant alleges that his constitutional right to a speedy trial has been violated: (1) the length of delay; (2) the reason for the delay; (3) whether the defendant asserted his right; and (4) prejudice to the defendant.” Ben v. State, 95 So.3d 1236, 1242 (¶ 7) (Miss.2012) (citing Barker, 407 U.S. at 530, 92 S.Ct. 2182). The Mississippi Supreme Court has stated that the Barker factors “are related and must be *736 considered alongside other relevant circumstances.” Id. (citing McBride v. State, 61 So.3d 138, 142 (¶ 5) (Miss.2011)).

A.Length of Delay

¶ 14. A review of the remaining Barker factors is triggered only by a finding that the State’s delay in bringing a defendant to trial is presumptively prejudicial. Ben, 95 So.3d at 1242 (¶ 9). “In Mississippi, a delay of more than eight months is considered presumptively prejudicial.” Id. (citing McBride, 61 So.3d at 142 (¶ 7)). Here, Ford was arrested on January 11, 2010, the day of the incident. His trial began on February 7, 2012. The just-over-two-year delay is presumptively prejudicial.

B.Reason for the Delay

¶ 15. Ford was released on bond the day after his arrest. Ten months later, the grand jury indicted Ford. The record reveals that, after the indictment, most of the delay in bringing Ford to trial was caused by Ford himself. Approximately one month after the indictment, Ford began requesting continuances. He requested three continuances — January 24, 2011; June 3, 2011; and October 12, 2011. Ford’s trial began at the next term of court. Ford’s requests for continuances created a thirteen-month delay — a delay that should not be attributable to the State. “[W]ell-taken motions for continuance may justify a delay in criminal cases.” Ben, 95 So.3d at 1243 (¶ 15) (quoting Flora v. State, 925 So.2d 797, 815 (¶ 63) (Miss.2006)) (internal quotation marks omitted).
¶ 16. Our supreme court has stated that in a pre-indictment analysis of due[-]process violations[,] ... the burden of persuasion is on the defendant. In order to prevail[,] ... [the defendant] must show that 1) the pre[-]indictment delay caused actual prejudice to him, and 2) such delay was an intentional device used by the government to obtain a tactical advantage over the accused.
Stack v. State, 860 So.2d 687, 700 (¶ 30) (Miss.2003) (internal citations omitted) (quoting De La Beckwith v. State, 707 So.2d 547, 569 (¶ 77) (Miss.1997)). Although the State has not offered a reason for the ten-month pre-indictment delay, Ford, who carries the burden in this analysis, has failed to show that the delay caused actual prejudice to him or that the State used the delay to gain a tactical advantage over him. Therefore, this factor weighs against Ford.

C.Assertion of Right to a Speedy Trial

 ¶ 17. “Ordinarily, a defendant’s failure to assert his right to a speedy trial weighs heavily against him.” Ben, 95 So.3d at 1244 (¶ 18) (citing Spencer v. State, 592 So.2d 1382, 1394 (Miss.1991)). Our supreme court “has determined that defendants have the responsibility to demand a speedy trial between their arrest and their indictment.” Id. at 1245 (¶ 19) (citing Young v. State, 891 So.2d 813, 818 (¶ 13) (Miss.2005)). “[A] defendant’s failure to do so in such instances is critical to an analysis of the speedy-trial issue.” Id. (quoting Young, 891 So.2d at 818 (¶ 13)). Ford never requested a speedy trial. As such, this factor weighs against Ford.

D.Prejudice to Ford

¶ 18. Ford contends that he has suffered prejudice as a result of the delay in bringing him to trial. As evidence of this prejudice, Ford states that witnesses were lost and that his defenses to the charges were diminished by the delay. He additionally alleges that the State, the circuit court, and his defense counsel conspired against him, as he never personally requested any of the continuances. Despite his allegations, Ford does not identify any *737 witness that he cannot locate or any defense that he could not present at trial as a result of the delay. Therefore, it cannot be said that Ford suffered any actual prejudice as a result of the delay between his arrest and his indictment. This factor weighs in favor of the State.
¶ 19. The record does not support a finding that the State violated Ford’s constitutional speedy-trial rights. Accordingly, this issue is without merit.

III. Certification of Prior-Convictions Documents

1120. Ford asserts that the State’s use of the certified pen-packs to prove his status as a habitual offender violated his constitutional right to confront the witnesses against him. The- Confrontation Clause prevents the admission into evidence “of out-of-court testimonial statements by an unavailable witness offered in a criminal trial to prove the truth of a matter asserted ... unless the defendant has had a prior opportunity to cross-examine the witness about the statement.” Frazier v. State, 907 So.2d 985, 996 (¶ 36) (Miss.Ct.App.2005). This Court has previously determined that pen-packs are not testimonial statements, which would trigger an analysis pursuant to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Frazier, 907 So.2d at 997 (¶ 42).
¶ 21. Here, the State did not call as a witness the individual who certified the pen-packs for the State’s use during trial. However, that individual was not required to testify before the pen-packs could be admitted as evidence of Ford’s prior convictions. As this Court stated in Frazier, “[i]f anything, the certificate on the pen[-]packs indicates that the custodian of records swore that the documents were true and correct copies, not that [the defendant] actually committed any act,” and the custodian would not have been qualified to testify to anything else. Id. Accordingly, this issue is without merit.
TV. Sharplin Instruction
¶ 22. Ford argues that his conviction and sentence as to the aggravated-assault charge should -be reversed because the circuit court failed to read to the jury the complete Sharplin instruction. Our supreme court has held that the circuit court, upon learning that a jury has been unable to reach a unanimous verdict, may give one of the following instructions:
[P]lease continue [your] deliberations[.] or
I know that it is possible for-honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this ease, then you should do so. Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.
Lafayette v. State, 90 So.3d 1215, 1218 (¶ 8) (Miss.2012) (emphasis added) (quoting Sharplin, 330 So.2d at 596). Here, after *738 deliberating for two hours, the jury indicated to the circuit court that it could not reach a verdict on Count I — the aggravated-assault charge. The court recessed for the evening. The following morning, the circuit court read the lengthier version of the Sharplin instruction to the jury. When reading the instruction to the jury, the court failed to read the last sentence of the instruction.
¶ 23. First, Ford’s counsel did not object to the court’s failure to read the last line of the instruction. Ford’s counsel also failed to request a mistrial as a result of the court’s failure to read the last line of the instruction. Therefore, Ford is procedurally barred from arguing this issue on appeal. See Hughes v. State, 90 So.3d 613, 623 (¶ 24) (Miss.2012).
¶ 24. Procedural bar aside, Ford’s argument is without merit. Ford relies on our supreme court’s decision in Bolton v. State, 643 So.2d 942 (Miss.1994), to argue that his conviction should be reversed. However, the facts of Bolton and the facts before this Court are significantly distinguishable. In Bolton, when reading the Sharplin instruction to the jury, the circuit court inserted language regarding the costs of trial and the possibility of impaneling another jury. Bolton, 643 So.2d at 943-44. The supreme court reversed Bolton’s conviction because it could not be sure that the improper instruction did not “taint the jury.” Id. at 945.
¶ 25. Here, prior to reading the instruction, the circuit court informed the jury that, in spite of its inability to reach a verdict, the court would not release the jury. After reading the instruction to the jury, the court let the jury return to deliberations. While the circuit court did err in not reading the complete Sharplin instruction, the error is harmless. The record is clear that the jury continued its deliberations until it reached a unanimous verdict, and there is no evidence that any statement from the circuit court coerced the jury to return with a guilty verdict. Accordingly, this issue is without merit.

V. Sufficiency and Weight of the Evidence

¶ 26. Ford requested a directed verdict twice during the trial — at the close of the State’s case and at the close of all of the evidence. By renewing his motion, Ford properly preserved this issue for appellate review. See Foster v. State, 928 So.2d 873, 879 (¶ 9) (Miss.Ct.App.2005). A motion for a directed verdict challenges the sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the State. Patton v. State, 109 So.3d 66, 82 (¶ 47) (Miss.2012). Thus, reversal is appropriate “only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.” Id. (quoting McClain v. State, 625 So.2d 774, 778 (Miss.1993)).
¶ 27. Conversely, a motion for a new trial challenges the weight of the evidence. Williams v. State, 89 So.3d 676, 683 (¶ 20) (Miss.Ct.App.2012). Our supreme court has stated:
A motion for a new trial is addressed to the discretion of the trial court, and such motion should be considered with caution. The power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. [Appellate courts] must weigh the evidence in the light most favorable to the verdict and must therefore look at the evidence in the light most favorable to the State’s *739 theory of the case. [Appellate courts] will disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.
Weeks v. State, 123 So.3d 373, 380 (¶ 14) (Miss.2013) (internal citations and quotation marks omitted).
¶28. Ford challenges the sufficiency and weight of the evidence presented against him at trial by attacking Lackey’s pretrial and in-court identifications of him. According to Ford, Lackey’s in-court identification of him was tainted because the pretrial identification was impermissi-bly suggestive and unreliable. We note that Ford did not participate in a lineup. Lackey saw Ford as he arrived at the sheriffs office with law enforcement officers. Later, after Ford’s interrogation, Lackey told officers that Ford was the individual who shot at his vehicle. Also, Ford did not object at trial to Lackey’s identification of him as the individual who shot at his vehicle; therefore, his argument on appeal attacking the identification is procedurally barred. See Parks v. State, 103 So.3d 772, 775 (¶ 9) (Miss.Ct.App.2012).
¶ 29. Nevertheless, Ford argues that because this initial procedure was tainted, Lackey’s in-court identification was tainted as well. It is settled that show-ups, which involve “showing suspects singly to persons for the purpose of identification,” have been condemned as being impermissibly suggestive. Whitlock v. State, 47 So.3d 668, 672 (¶ 9) (Miss.2010) (quoting Roche v. State, 913 So.2d 306, 310-11 (¶ 12) (Miss.2005)). However, Lackey’s opportunity to see Ford at the sheriffs office was not arranged by law enforcement officers. In fact, officers were not aware that Lackey saw Ford until later. During trial, Investigator Polk testified:
Yes, as we were going into the jail, Mr. Lackey was able to see him, and after questioning [Ford], a few minutes later, after going into booking, I came back out to the Sheriffs Department!,] which is in conjunction with the jail. I came out and Mr. Lackey had stated, ‘Yes, sir, that’s who done the shooting.”
Therefore, Lackey’s positive identification of Ford was not suggested or coerced by law enforcement officers.
¶ 30. Even if Lackey’s view of Ford at the sheriffs office could be characterized as a show-up for identification purposes, the inquiry does not end with the presence of an impermissibly suggestive identification. Roche, 913 So.2d at 311 (¶ 14). “Such identification is admissible if, considering the totality of the circumstances surrounding the identification procedure, the identification did not give rise to a very substantial likelihood of misiden-tification.” Id. (citing York v. State, 413 So.2d 1372, 1383 (Miss.1982)). In Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court laid out the factors to consider in determining “whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive”:
As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witnesses] degree of attention, the accuracy of the witnesses] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Whitlock, 47 So.3d at 672 (¶ 10) (quoting Biggers, 409 U.S. at 199, 93 S.Ct. 375).
*740 ¶ 31. When analyzing this case according to the Biggers factors, it cannot be said that the law enforcement officers’ conduct, if impermissibly suggestive, gave rise to a very substantial likelihood of irreparable misidentification. Lackey testified that he saw Ford, from approximately twenty yards away, exiting his mobile home and walking towards a gold SUV. Lackey saw that same gold SUV speeding towards him and being driven by the same individual that he saw exit the mobile home. Lackey was certain that it was the same individual because he saw the individual’s head and shoulders “hanging out the window [of the gold SUV] with a gun on the mirror[.]” Additionally, Lackey identified Ford shortly after this incident. Accordingly, the circuit court did not err in allowing Lackey’s in-court identification of Ford. Also, Deputy Lingle testified that he and other officers recovered a .40-caliber weapon and male clothing from the mobile home, matching the description of the clothing worn by the shooter. In light of these facts, it cannot be said that the evidence supporting Ford’s convictions is insufficient or that allowing the verdict to stand would sanction an unconscionable injustice. This issue is without merit.

VI. Cumulative Error

¶ 32. Ford contends that the cumulative effect of the errors in this case requires reversal of his conviction and sentence. Under the cumulative-error doctrine, “individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.” Ross v. State, 954 So.2d 968, 1018 (¶ 138) (Miss.2007). As the circuit court committed no errors at trial, there can be no reversal based on cumulative errors. Accordingly, this issue is without merit.
¶ 33. THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, AGGRAVATED ASSAULT, AND SENTENCE, AS A HABITUAL OFFENDER, OF TWENTY YEARS; AND COUNT II, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE, AS A HABITUAL OFFENDER, OF TEN YEARS, WITH THE SENTENCE IN COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO SCOTT COUNTY.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Sharplin v. State, 330 So.2d 591 (Miss. 1976).